HITCHMAN COAL & COKE CO. v. MITCHELL et al.

(District Court, N. D. of West Virginia.   December 23, 1912.)

1. TRADE UNIONS (§ 1*)—STATUS UNDER COMMON LAW.
    Under the common law which governs in West Virginia, labor union
    combinations must be considered in their threefold relation: (a) To their
    own members; (b) to those who may employ such members; and (c) to
    the public interests.

    [Ed. Note.—For other cases, see Trade Unions, Cent. Dig. § 1; Dec.
    Dig. § 1.*]

2. MONOPOLIES (§ 12*)—STATUS AND POWERS UNDER COMMON LAW—RELA-
    TIONS TO MEMBERS.
    In their relation to their respective members, labor unions cannot un-
    dertake to require, by oath, obligation, constitution, by-law, or rule, a
    surrender by such members of their individual freedom of action, and,
    when they seek to do so, they become illegal combinations in restraint
    of trade.

    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec.
    Dig. § 12.*] ·

3. MONOPOLIES (§ 12*)—STATUS UNDER COMMON LAW—LEGALITY.
    The question of the legality of a labor union combination is to be de-
    termined from an examination of the union's constitution, by-laws, or
    rules, as they may be called, and, where some of such rules are lawful,
    yet, if others unlawful in character are of such weight and importance
    as to dominate the course of the union's action, or if the lawful and un-
    lawful ones are so interdependent or intermingled as to render their
    separation impracticable, the organization becomes wholly illegal as in
    restraint of trade.

    [Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig.
    § 12.*]

4. MASTER AND SERVANT (§§ 338, 339*)—INTERFERENCE BY THIRD PERSONS.
    Labor unions in their relations to employers of their members, while
    they may use all peaceful efforts to advance the interests of their mem-
    bers in the way of aiding them to secure better wages, shorter hours
    of labor, and better conditions in which to work, may not accomplish
    these ends by violence, coercion, or intimidation on their part or at their
    instance.   They may not induce their members to break existing con-
    tracts with their employers, nor interfere by intimidation or coercion
    with the inherent right of the employer to control his property and con-
    duct his business in any lawful manner he may choose, and while they
    have the lawful right to advise their members to strike, where not in
    violation of contracts, and by reasoning or persuasion endeavor to pre-
    vent others from taking their places, neither they nor their members
    have any right by intimidation or coercion to prevent other laborers or
    any of the members of the union from taking employment with such
    employer.

    [Ed. Note.—For other cases, see Master and Servant, Cent. Dig. § 1283;
    Dec. Dig. §§ 338, 339.*]

5. MONOPOLIES (§ 12*)—ILLEGAL COMBINATIONS—LABOR UNIONS.
    Neither a labor union nor its members may, under the law, use any
    means of coercion or intimidation to compel others to join the union,
    or to prevent a member from leaving the union if he desires or other-
    wise to interfere with the inherent right of the individual, whether a
    member or not, to dispose of his own labor or capital according to his

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

own will; and in their relations to the general public as consumers of the products of labor and capital such unions are governed by the same rules of law as to combinations in restraint of trade as are combinations of capital.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

**6. MONOPOLIES (§ 12*)—CONSPIRACY (§ 8*)—ILLEGAL COMBINATIONS—UNITED MINE WORKERS OF AMERICA.**

The United Mine Workers of America is an unlawful organization because of its principles as set forth in its constitutions, obligations of its members, and rules which (1) require its members to surrender their individual freedom of action; (2) seek to require in practical effect all mine workers to become members, whether desirous of doing so or not; (3) to control and restrict, if not to destroy, the right of the mineowner to contract with his employés independent of the organization; (4) to exclude his right to employ nonunion labor if he desires; (5) to limit his right to discharge, in the absence of contract, whom he pleases, when he pleases, and for any cause or reason that to him seems proper; and (6) assume the right through its officers to control the mineowner's business by shutting down his mine, and calling out his men upon indefinite strike in obedience to their obligation to the union, whether the men desire to quit work or not, whenever such officers deem it to the best interests of the union and regardless of his rights or interests, or the loss, direct and indirect, which he may sustain. It is also unlawful because of its procedure and practices, in that (1) it seeks to create a monopoly of mine labor such as to enable it as an organization to control the coal mining business of the country; and (2) has by express contract joined in a combination and conspiracy with a body of rival operators, resident in other states, to control, restrain, and to an extent at least destroy the coal trade of West Virginia, and by the admission of its officers has spent 14 years time and hundreds of thousands of dollars in effort to accomplish such purpose.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12;* Conspiracy, Cent. Dig. §§ 7–11; Dec. Dig. § 8.*]

**7. MONOPOLIES (§ 12*)—COMBINATIONS—INTERFERENCE WITH INTERSTATE COMMERCE.**

Complainant company commenced the operation of a coal mine in West Virginia with nonunion miners. It was shortly notified by officers of the United Mine Workers of America that, unless it unionized its mine, a union mine in Ohio in which some of its stockholders were interested would be shut down, and it yielded; its workmen forming a union. A strike was ordered the next day, which was settled. In the next three years three strikes were ordered, and complainant was subjected to a loss thereby of $48,000. At the time of the last, which was a general strike, it offered to comply with the terms demanded, and its employés desired to continue work, but were not permitted. They became dissatisfied, withdrew from the union, and made individual contracts with complainant by which it was agreed that the mine should remain nonunion. Defendants, who were officers of the union, undertook to organize another local union at the mine, and threatened to shut it down unless it should be again unionized. Some time previously they had entered into an agreement with operators in other states who were competitors of the West Virginia mines by which they undertook to unionize the latter, so that they could control conditions and lessen competition. *Held,* that such agreement was unlawful, as in restraint of interstate commerce, and that complainant was entitled to relief by injunction.

[Ed. Note.—For other cases, see Monopolies, Cent. Dig. § 10; Dec. Dig. § 12.*]

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

8. EVIDENCE (§ 253*)—SUIT TO RESTRAIN UNLAWFUL COMBINATION—EVIDENCE —DECLARATIONS.

On the question whether a combination is lawful or not, declarations of those engaged in it, explanatory of acts done in furtherance of its objects, are competent evidence after the combination has been proved.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 994–1002; Dec. Dig. § 253.*]

In Equity. Suit by the Hitchman Coal & Coke Company against John Mitchell and others. On final hearing. Decree for complainant. For prior opinion, see 172 Fed. 963.

George R. E. Gilchrist, of Wheeling, W. Va., for plaintiff.

Charles E. Hogg, of Morgantown, W. Va., for defendants.

DAYTON, District Judge. On September 21, 1909, I filed a written opinion in this cause, reported in (C. C.) 172 Fed. 963. I there stated the purposes and objects of the bill and the proceedings had thereon and in the cause to that date. I do not, because of the necessary length of this opinion made necessary by the gravity and importance of the questions involved, deem it expedient to reiterate the statement of the case there made, but refer to this prior opinion therefor. Suffice it to say that to my order refusing to modify and in part dissolve the injunction based upon the reasons set forth in that opinion an appeal was taken by the served defendants to the Circuit Court of Appeals for this circuit. That court, on March 11, 1910, dismissed such appeal for want of jurisdiction. 100 C. C. A. 137, 176 Fed. 549. The parties then proceeded to mature the cause for final hearing. The evidence was taken in open court before me. This evidence and the record in bulk is now estimated to be equivalent to between 7,000 and 8,000 pages. Briefs of counsel filed are equivalent to near 800 more such pages, and the learning, research, and legal ability displayed by counsel on both sides in these briefs are such as to command not only the court's gratitude, but its highest admiration. The sincere purpose to aid, in every possible way, the true and right determination of the cause on the part of these counsel, deserves special commendation.

I have given several months' consideration and study to the questions involved. Because of their importance, I have, upon this final hearing, deemed it proper to review, as briefly as possible, the origin of labor unions in England, and the legislation and judicial decisions touching their rights, privileges, and obligations in that country, as well as under our federal and local state laws and judicial decisions.

Without tracing the distinction recognized in England between guilds and combinations of common laborers from which spring substantially the labor unions of to-day, it is sufficient to say that the emancipation of the serfs in the time of Edward III increased largely the number of laborers and the competition in the labor market, but in the middle of the fourteenth century, when the plague carried off 2,000,000 souls, near half the population of the realm, conditions became reversed— labor became very scarce, food rose in price, and higher wages were

demanded by labor. In consequence the Statutes of Laborers were passed in 1349 and 1350, fixing wages absolutely for the summer months, and authorizing the justices of the peace to fix them for the winter ones. These acts further designed to accomplish the other purpose of tying down the liberated serfs who had become laborers to the soil. A laborer was required under pain of imprisonment to remain in his parish, and it was made an offense to refuse to work or to receive or offer higher wages than those fixed by the statutes. These statutes were passed clearly in aid of the agricultural interests of a kingdom with limited resources in that regard, seeking to supply food products for its people. They looked especially to the interest of the consuming public, and not to those of the laborer. In the reign of Henry VIII the monasteries were suppressed, and, in consequence, a large number of unemployed persons were turned out to wander over the country. Thereupon the Statute of Apprentices was enacted "in great hope, that being duly executed, it shall banish idleness, advance husbandry and yield unto the hired, both in the time of scarcity and in the time of plenty, a convenient proportion of wages." This act confirmed the former ones regulating work and wages, and, in addition, fixed the hours of labor, and required the laborer to secure from the master a certificate that he had completed his work for him before seeking work in a new district. These acts fell into desuetude by the beginning of the last century, and state regulation of wages became superseded by contractual relationships between master and servant. The result was that labor, which had before that time opposed state regulation of wages, changed front, and began petitioning Parliament for such regulation and the enforcement of the Apprentice Act. Human nature is the same substantially yesterday, to-day, and forever. It was very natural that laboring men, seeking to better their condition in life, should a century age clamor for the legislative regulation when work was dull and the laborers many, which they had opposed the preceding century when harvests were plenty and laborers few. It is just as natural to-day that from the vast army of laborers engaged in the coal mining industry constantly depressed by over production demands should come for legislative enactment of wage scales minimum at least, and, in the absence of such legislation, efforts on their part should be made by combination to achieve the same result. The question always recurs whether either method can best supersede the natural law of supply and demand. The English courts at the time manifestly thought not, for when organized trade societies, about 1800, instituted actions and sent petitions to Parliament to enforce the Apprentice Act (fixing wages), they held that the act only applied to industries existing at the time of its passage in 1563, thereby rendering it practically ineffective, and, in 1813, Parliament formally repealed it. During these two and a third centuries the Apprentice Act, fixing wages, necessarily forbade labor combinations having for their purpose the securing of wages beyond the limit fixed by the law.

In addition, the common-law doctrine "of restraint of trade" rendered such combinations illegal. In 1797 an act, reaffirmed in 1800,

known as the Combination Act, was passed, making unlawful every combination seeking to secure advance of wages, to change or decrease the hours of work, to prevent any employer from hiring any one he chose, to prevent workmen hiring themselves, to induce workmen to leave their work to attend any meeting called to advance any of these objects, or to spend any money for these purposes.

It is important to pause here, and bear in mind that the three charters granted to Virginia in 1606, 1609, 1611–12, all expressly provided that the laws and ordinances enacted by it should conform to those existing and in force in England; that under its six state Constitutions (1776, 1830, 1850, 1864, 1870, and 1902) the fact has always been recognized that the common law of England in force prior to the Revolution was the basic law of the state, save and except so far as repealed or modified by either constitutional or legislative enactment; that in the first Constitution of West Virginia (1861–63) it is enacted:

"Such parts of the common law and of the laws of the state of Virginia as are in force within the boundaries of the state of West Virginia when this Constitution goes into operation, and are not repugnant thereto, shall be and continue the law of the state until altered or repealed by the Legislature." Article 11, § 8.

The same provision was incorporated in the Constitution of 1872.

This being true, it is all-important to the correct determination of the questions here involved to determine (a) just what the common law was at the time prior to the birth of Virginia as regards these labor organizations; and (b) how far that law has been repealed or modified by legislative enactment in Virginia and West Virginia. While there have been very many conflicting decisions in the different states of the Union, it seems to me that the questions are essentially local in character, and must be determined by local law. It is certainly an inherent power of each state to determine for itself how law and order shall be maintained and crime punished. This power necessarily carries with it the right to determine what assemblies meeting within its limits are lawful or unlawful, for what lawful purposes organization may be had, and for what purposes it may be unlawful to organize and operate within its limits. This inherent power in the state can only be superseded by the very limited power of the national government to interfere provided for by the federal Constitution. For this reason, it seems clear to me that I must determine what constitutes a lawful organization in West Virginia by its laws, and not by either statutes or judicial decisions of other states. What may be lawful in one may be unlawful in another, what may be criminal in one may be permissible in another. In this view of the matter, the subsequent legislation and decisions in England become immaterial, except so far as they may aid us in defining the true principles of the common law existing prior to 1776, and still existing in this state. It will be sufficient to say that the Combination Act of 1800 was, in 1825, repealed by the English Parliament, and conspiracy alone became the combination liable to prosecution. For common-law conspiracy a number of the members of trades unions were prosecuted for combining to raise

wages and for other of their declared purposes, and convictions were had. In 1856 Crompton declared:

"That all combinations tending directly to impede and interfere with the free course of trade were not only illegal but criminal."

In 1859 Parliament passed an act more closely defining the offense of "molestation and obstruction" used in the act of 1825. It rendered peaceful persuasion to induce workmen to abstain from working, in order to raise their wages, lawful. Was this act necessary because prior to it such persuasion for such purpose under the common law was unlawful? If so, has that common-law rule been abrogated in West Virginia by subsequent legislation? These questions must be considered later. Under this act of 1859, it was held by the Queen's Bench (1867) by Cockburn, C. J.:

"I am very far from saying that the members of a trade union, constituted for the purpose not to work, except under certain conditions, and to support one another in the event of being thrown out of employment, in carrying out the views of the majority would bring themselves within the criminal law, but the rules of the society would certainly operate in restraint of trade, and therefore in that sense be unlawful."

The labor unions thereupon secured the passage of the act of 1871, providing that:

"The purposes of any trade union shall not, by reason merely that they are in restraint of trade be deemed to be unlawful, so as to render any member of such trade union liable to criminal prosecution for conspiracy or otherwise."

Was this act secured to repeal another common-law rule existing prior? If so, has such common-law rule been abrogated in West Virginia? If not, could Congress, by virtue of its power to regulate interstate trade, traffic, or commerce, interfere with or prevent this state's enforcement of it as regards intrastate trade? This act of 1871 was the result of the long agitation preceding, which had resulted in the appointment of a royal commission by Queen Victoria in 1867, and which commission had made 10 preliminary reports, and its final one on March 9, 1869. As a result the government introduced a bill to legalize trade unions so far as they, being combinations, were in restraint of trade, and, in addition, the bill included certain clauses which made criminal certain acts of theirs. Objection was made by the unions to these criminal provisions. The result of the long agitation that followed was that the bill was cut in two, one being St. 34, 35 Vict. c. 31, known as the Trade Union Act of 1871, above referred to, the other the Criminal Law Act 1871 (St. 34, 35 Vict. c. 32). By four years of agitation the unions secured the appointment of another royal commission which reported in 1875. Following this report Parliament repealed the Criminal Law Amendment Act, 1871 (St. 34, 35 Vict. c. 32), and passed the Criminal Conspiracy and Protection of Property Act, 1875 (St. 38, 39 Vict. c. 86), and in 1876 amended the Trade Union Act, 1871, by an act known as the Trade Union Act (1871) Amendment Act, 1876, and the two together, it was provided, were to be cited as the "Trade Union Acts, 1871 and 1876." The "Conspiracy and Protection of Property Act, 1875," was amended by an

act known as "The Trades Disputes Act, 1906," and it was provided that it and the "Trade Union Acts 1871 and 1876," together might be cited as the "Trades Union Acts 1871 to 1906." These embrace the existing statutory law of England touching labor unions.

The Trade Union Act of 1871 provides:

"2. The purposes of any trade union shall not, by reason merely that they are in restraint of trade, be deemed to be unlawful, so as to render any member of such trade union liable to criminal prosecution for conspiracy or otherwise.

"3. The purposes of any trade union shall not, by reason merely that they are in restraint of trade, be unlawful so as to render void or voidable any agreement or trust.

"4. Nothing in this act shall enable any court to entertain any legal proceedings instituted with the object of directly enforcing or recovering damages for the breach of any of the following agreements, namely,

"(1) Any agreement between members of a trade union as such, concerning the conditions on which any members for the time being of such trade union shall or shall not sell their goods, transact business, employ, or be employed;

"(2) Any agreement for the payment by any person of any subscription or penalty to a trade union;

"(3) Any agreement for the application of the funds of a trade union,—

"(a) To provide benefits to members; or,

"(b) To furnish contributions to any employer or workman not a member of such trade union, in consideration of such employer or workman acting in conformity with the rules or resolutions of such trade union; or

"(c) To discharge any fine imposed upon any person by sentence of a court of justice; or,

"(4) Any agreement made between one trade union and another; or

"(5) Any bond to secure the performance of any of the above-mentioned agreements.

"But nothing in this section shall be deemed to constitute any of the above-mentioned agreements unlawful.

"5. The following acts, that is to say,

"(1) The Friendly Societies Acts, 1855 and 1858, and the acts amending the same;

"(2) The Industrial and Provident Societies Act, 1867, and any act amending the same; and

"(3) The Companies Acts, 1862 and 1867, shall not apply to any trade union, and the registration of any trade union under any of the said acts shall be void, and the deposit of the rules of any trade union made under the Friendly Societies Acts, 1855 and 1858, and the acts amending the same, before the passing of this act, shall cease to be of any effect."

Section 6 then provides that any seven or more members of a trade union may register such trade union, "provided that if any one of the purposes of such trade union be unlawful such registration shall be void." Section 7 authorizes a registered union or any branch of it under the act to purchase and lease land not exceeding one acre in the name of trustees to sell, exchange, and mortgage the same. Section 8 vests all land and personal property of the union or of its branches in the trustees selected therefor and their successors. Section 9 authorizes such trustees to sue and be sued touching the property rights of the union. Section 10 limits personal liability of such trustees to funds actually received by them as such. Section 11 requires the treasurer of the union to render to the trustees accounts of moneys, bonds, or securities received by him at such times as the union rules may prescribe, and, if required, to turn over to the trustees

balances in his hands and all books, papers, and property of the union. Section 12 provides for legal enforcement and criminal punishment of any officer, member, or other person fraudulently obtaining possession of, withholding, or misappropriating funds or property of the union so registered. Section 13 provides the rules of registration to be: (1) By an application with printed copies of the union's rules, and a list of the titles and the names of its officers sent to the registrar who (2) shall become satisfied that the union has complied with the requirements of the act. (3) That no union shall register under a name identical or so nearly the same as to deceive with that of another existing registered union. (4) Where the union has been in operation for more than a year before application made for registration, a general statement of the receipts, funds, effects, and expenditures of such union to be delivered to the registrar. (5) The certificate of registry unless proved to have been withdrawn or canceled to be conclusive that the requirements of the act have been complied with. (6) One of the Secretaries of State to have power to make regulations from time to time touching details of registration, the forms to be used, the inspection of documents kept by the registrar and the fees to be paid for registration. Section 14 provides (1) that the rules of the union shall contain provisions in respect to the several matters mentioned in the first schedule of the act; and (2) that a copy thereof shall be delivered to any person by the union on payment of a sum not exceeding one shilling. Section 15 provides that every registered union shall have a registered office. Section 16 provides that a general statement of the receipts, funds, effects, and expenditures of the union be on the 1st of June of each year transmitted to the registrar, together with any alterations in rules or changes in officers of the union. Section 17: Registrars to report annually to Parliament. Section 18 makes it a misdemeanor to circulate with intent to defraud other than the existing rules of a union. Sections 19, 20, 21, 22, and 23 relate to legal proceedings for the enforcement of the fines and penalties provided for in the act and of definitions of terms used and "the First Schedule" defines six matters to be provided for by the union's rules: (1) The name and place of meeting for business; (2) the whole of the union's objects, and the purposes for which its funds shall be applicable, the conditions under which a member may become entitled to benefits, and the fines and forfeitures that may be imposed; (3) the manner of making, altering, amending, or rescinding the rules; (4) a provision for the appointment and removal of a general committee of management, of trustees, treasurers, and other officers; (5) a provision for the investment of the funds, and an annual audit of accounts; (6) inspection of the books and roll of membership by every person having an interest in the union's funds. The amendments provided by the act of 1876 do not change these provisions, but enlarge them by (1) allowing unions to pay money on the death of a child under 10 years of age; (2) providing for transfer of union's funds from the estate of a bankrupt trustee to a new trustee; (3) requiring registration by registered unions in all countries where the unions operate; (4) regulating the withdrawal and cancellation of registration certifi-

cates; (5) allowing one under 21, but over 16 years, of age to become member of a registered union, and providing how funds due him may be paid by the union; (6) providing how a registered union may change its name; (7) that two or more unions may amalgamate and the proceedings necessary thereto; (8) and how a union may dissolve.

The Conspiracy and Protection of Property Act, 1875, provides:

"An agreement or combination by two or more persons to do or procure to be done any act in contemplation or furtherance of a trade dispute shall not be indictable as a conspiracy if such act committed by one person would not be punishable as a crime.

"An act done in pursuance of an agreement or combination by two or more persons shall, if done in contemplation or furtherance of a trade dispute, not be actionable unless the act, if done without any such agreement or combination, would be actionable.

"Nothing in this section shall exempt from punishment any persons guilty of a conspiracy for which a punishment is awarded by any act of Parliament.

"Nothing in this section shall affect the law relating to riot, unlawful assembly, breach of the peace, or sedition, or any offense against the state or the sovereign."

It makes it criminal for (1) an employé of a municipality, alone or in combination with others, to break his contract of employment if he has reasonable cause to believe his doing so will deprive the inhabitants of the place wholly or to a great extent of gas or water; (2) to break a contract of hiring when there is reasonable cause to believe the doing so will endanger life, cause serious bodily injury, or expose valuable property, real or personal, to destruction or serious injury, for a master legally bound to furnish his servant with food and clothing to fail to do so where such failure is likely to impair seriously the health of the servant. It then provides:

"Every person who, with a view to compel any other person to abstain from doing or to do any act which such other person has a legal right to do or abstain from doing, wrongfully and without legal authority,—

"(1) Uses violence to or intimidates such other person or his wife or children, or injures his property; or,

"(2) Persistently follows such other person about from place to place; or,

"(3) Hides any tools, clothes, or other property owned or used by such other person, or deprives him of or hinders him in the use thereof; or,

"(4) Watches or besets the house or other place where such other person resides, or works, or carries on business, or happens to be, or the approach to such house or place; or,

"(5) Follows such other person with two or more other persons in a disorderly manner in or through any street or road, shall, on conviction thereof by a court of summary jurisdiction, or on indictment as hereinafter mentioned, be liable either to pay a penalty not exceeding twenty pounds, or to be imprisoned for a term not exceeding three months, with or without hard labour.

"Attending at or near the house or place where a person resides, or works, or carries on business, or happens to be, or the approach to such house or place, in order merely to obtain or communicate information, shall not be deemed a watching or besetting within the meaning of this section." Repealed by section 2, Trade Disputes Act, 1906.

The remainder of its provisions relate to the legal proceedings to be pursued in its enforcement, to definitions of its terms and to its application to Scotland and Ireland.

The Trade Disputes Act, 1906, provides:

"1.—The following paragraph shall be added as a new paragraph after the first paragraph of section three of the Conspiracy and Protection of Property Act, 1875:

"'An act done in pursuance of an agreement or combination by two or more persons shall, if done in contemplation or furtherance of a trade dispute, not be actionable unless the act, if done without any such agreement or combination, would be actionable.'

"2.—(1) It shall be lawful for one or more persons, acting on their own behalf or on behalf of a trade union or of an individual employer or firm in contemplation or furtherance of a trade dispute, to attend at or near a house or place where a person resides or works or carries on business or happens to be, if they so attend merely for the purpose of peacefully obtaining or communicating information, or of peacefully persuading any person to work or abstain from working.

"(2) Section seven of the Conspiracy and Protection of Property Act, 1875, is hereby repealed from 'attending at or near' to the end of the section.

"3.—An act done by a person in contemplation or furtherance of a trade dispute shall not be actionable on the ground only that it induces some other person to break a contract of employment or that it is an interference with the trade, business, or employment of some other person, or with the right of some other person to dispose of his capital or his labor as he wills.

"4.—(1) An action against a trade union, whether of workmen or masters, or against any members or officials thereof on behalf of themselves and all other members of the trade union in respect of any tortious act alleged to have been committed by or on behalf of the trade union, shall not be entertained by any court.

"(2) Nothing in this section shall affect the liability of the trustees of a trade union to be sued in the events provided for by the Trades Union Act, 1871, section nine, except in respect of any tortious act committed by or on behalf of the union in contemplation or in furtherance of a trade dispute."

In giving this very limited review of the origin and progress of English legislation touching trade unions, I have not stopped to cite authorities. It will be sufficient for me to say that by aid of counsel I have had before me and have consulted the English works, Greenwood on the Law Relating to Trade Unions, Chalmers-Hunt on Trade Unions, Davis' Labour Laws, Wright's Criminal Conspiracies, Webb's History of Trade Unionism, Schlosser and Smith Clark's Legal Position of Trade Unions, Webb's Industrial Democracy, 14 Enc. Laws of England, Eleventh and Final Report of the Royal Commissioners (First Commission Appointed) 1869, and Second and Final Report of the Commissioners (Second Appointed) 1875.

It is somewhat difficult to define the exact status of these unions under the involved and confusing legislation existing to-day in England. Their position in the body politic is certainly anomalous. Discussing the Trade Union Act of 1871, Farwell, L. J., in the Taff Vale Case (1901) 1 K. B. 170, says:

"A trade union is neither a corporation, nor an individual, nor a partnership between individuals. It is an association of men which almost invariably owes its legal validity to the Trade Union Acts 1871–76, * * * and the Legislature in giving a trade union the capacity to act by agents, has without incorporating it, given it two of the essential qualities of a corporation."

Provisions are made for registered unions, but the acceptance of such provisions is purely voluntary. These registered unions obtain few privileges that are not enjoyed by those unregistered. It is very

doubtful whether class legislation of this character could be enacted and enforced in the United States by reason of constitutional limitations, both federal and state. It is to be always borne in mind that the power to legislate is supreme and unrestricted in the English Parliament, while always limited here by the written federal and state Constitutions. However, we are not called upon to pass upon the constitutionality of such legislation for none such exists under federal statute, or by laws of West Virginia as we shall presently show. However, some limitations in England still exist, under this legislation, upon the acts and proceedings of union organizations, that tend clearly to establish common-law principles existing in this state by which we must be bound. Some of these it seems important to indicate.

First. At least, prior to the last act (1906), which provided by its section 3 that "an act done by a person in *contemplation or furtherance of a trade dispute* shall not be actionable on the ground only that it induces some other person to break a contract," it was clearly unlawful for these unions by their trustees and officers to induce or procure men to break contracts with their employers. This was distinctly held by the House of Lords in 1901 in the case of Quinn v. Leathem A. C. 495, 70 L. J. P. C. N. S. 76, 65 J. P. 708, 50 Week. Rep. 139, 85 L. T. N. S. 269, 17 Times L. R. 749, and in South Wales Miners' Federation v. Glamorgan Coal Co. (1905) A. C. 239, 74 L. J. K. B. N. S. 525, 53 Week. Rep. 593, 92 L. T. N. S. 710, 21 Times L. R. 441. This latter case, as reported in 1 British Ruling Cases, 1, will be found to involve closely a similar condition of fact existing here. The coal company and 73 other plaintiffs brought action against the Miners' Federation, its trustees, officers, and certain members of its executive council for wrongfully and maliciously procuring and inducing its workmen in the mines to break their contracts of service with the plaintiffs. It appeared that the Federation (a registered trade union) fearing that the action of merchants and middlemen would reduce the price of coal, and consequently the rate of wages, ordered a "stop day," obeyed by over 100,000 men who took a holiday, and thereby broke their contracts of service. Subsequently four additional "stop days" were ordered, and the men ceased work in violation of their contracts. It was found this advice to the men on the part of the Federation's council was given without malice. Bigham, J., dismissed the action. The Court of Appeal reversed the judgment, and awarded damages to the plaintiffs. (1903) 2 K. B. 545, 72 L. J. K. B. N. S. 893, 89 L. T. N. S. 393, 19 Times L. R. 708. Upon appeal to the House of Lords, the Court of Appeal was affirmed and the Federation's appeal dismissed; the Earl of Halsbury, L. C., Lord Machaghten, Lord James, and Lord Lindley delivering concurring opinions. Good faith was there held to be no justification; "that to combine to procure a number of persons to break contracts is manifestly unlawful." This ruling is in full accord with our American decisions which sustain the right to an injunction against the officers of a labor union to restrain them from inducing members of such organization to strike in violation of their contracts of employment, or which hold them liable in damages therefor. Holder v. Cannon Mfg. Co. (1904) 135 N. C. 392, 47 S. E. 481; Tubular

Rivet & Stud Co. v. Exeter Boot & Shoe Co. (1908) 86 C. C. A. 648, 159 Fed. 824; A. R. Barnes & Co. v. Berry (1907) (C. C.) 156 Fed. 72; Old Dominion S. S. Co. v. McKenna (1887) (C. C.) 30 Fed. 48; Thomas v. Cincinnati, N. O. & T. P. R. Co. (1894) 4 Interst. Com. R. 788, 62 Fed. 816; Thacker Coal & Coke Co. v. Burke (1906) 59 W. Va. 253, 53 S. E. 161, 5 L. R. A. (N. S.) 1091, 8 Ann. Cas. 885. Attached to the report of this last case in 5 L. R. A. (N. S.) 1091, will be found a very valuable note citing many additional authorities. It would seem clear that section 3 of the English Act 1906, above referred to, can only effect the enforcement of this principle in England when a trade dispute is on between the same particular employer and his employés, and therefore that no sanction for the claim for the so-called sympathetic strike can be found in it where the breaking of contracts is involved.

Second. The Conspiracy Act 1875, it will be observed, expressly makes criminal all violence and intimidation against any person to prevent him from exercising his legal rights, or against his wife or children, or injury to his property, from persistently following him from place to place, from hiding his tools, clothes, or other property, or from depriving or hindering in the use thereof, from watching or besetting his house or place of business or the approach thereto, or from following such other person with two or more others in a disorderly manner through any street or road. In detail specification of forbidden acts this English statute possibly has gone farther than many of our American court decisions have gone as regards what shall be considered as intimidation and violence, nevertheless the general principle is the same, and is fully recognized in this country, as also the right to resort to injunction to stay such violence and intimidation. It is needless to cite the vast number of cases establishing this principle in this country beyond peradventure.

Third. It will be noted what stress is laid by this English legislation upon the rules that may be adopted by the unions. In order for them to have the benefit of registration, these rules must be filed with the registrar. All changes therein must be reported, and they are to be printed and copies furnished on demand of any one upon payment of a nominal fee. The clear purpose of this publicity is that it may be apparent to the public just how far the union is lawful in its organization and designs, and that the courts, when appealed to, may determine the character of the union by an examination of its rules. As a result, since these acts were passed, the English courts have been called upon to determine by such examination whether several of these organizations were lawful or not. From these decisions can be ascertained some very valuable information as to what penalties and obligations can be enforced by these unions against (a) its own members; (b) against the interests of its members' employers; and (c) against the interests of the public.

In Chamberlain's Wharf Limited v. Smith (1900) 2 Ch. Div. 605:

"The rules of an association, called the Tea Clearing House, the members of which were dock companies and tea warehouse keepers carrying on the business of warehousing tea in bond, provided (rule 11) that every member should charge on teas the respective rates and adhere to the terms and con-

ditions specified in a schedule to the rules, and should not be at liberty to depart from them in any way, except that a discount not exceeding 10 per cent. might be allowed on the said rates. No other discount, no money gratuities, and no advantages, direct or indirect, should be offered or allowed by any member ·to any merchant, broker, or other person in connection with any matter or thing in any wise relating to the Tea Clearing House agreement. By rule 14 no subscriber should be entitled to warehouse or deposit tea with, or employ in connection with tea, any dock company or tea warehouse keeper who was not a member of the Clearing House, or ·to purchase or sample any tea from the 'warehouse of any nonmember. By rule 15 any member breaking or failing to observe any of the rules was to be liable to expulsion by resolution of the committee. The committee passed a resolution expelling the plaintiffs for an alleged breach of the rules, and they brought an action against the members of the committee to restrain them from acting on the resolution, on the ground (inter alia) that the plaintiffs had not had an opportunity of being heard in their defense. Kekewich, J., granted an interlocutory injunction. Held, on appeal, that the association was a 'trade union' within the meaning of section 16 of the Trade Union Act Amendment Act, 1876; that its objects were illegal independently of the Trade Union Act, 1871; and that section 4 of that act prevented the court from directly enforcing the agreement between the members: Held, also, that by granting the injunction the court would be directly enforcing the agreement. The injunction was accordingly dissolved."

In Cullen v. Elwin (1903) 88 L. T. 686:

"Under the rules of the Amalgamated Society of Tailors, it was provided by rule 34, 'Trade Regulations,' that during slack seasons a fair equitable division of trade shall be compulsory in all shops. That a fair equitable division of trade shall be understood to mean that each man shall get trade to the same value as his fellowman or as near it as possible. In no shop shall the dual system of piece work and day wage be allowed to exist. No member of this society shall in future be allowed to leave a workshop for the purpose of working outdoors or at home, except by the express permission of his ·branch committee, such permission only to be granted in case of physical inability to remain in the workshop, and to be in all cases indorsed ·by a general meeting of the members of the branch. Any member breaking the rules and allowing himself ˙to run out of society and still work for a society shop, the branch shall have full power to deal with the matter as they deem best subject to rules 32 and 33. That a working week shall not exceed fifty-four hours, each district or town to regulate its own time of starting in the morning and leaving off in the evening and that no overtime be worked except in cases of necessity. Time lost on one day cannot be made up on the following or any subsequent day. Members infringing this rule shall be dealt with as the branch directs, subject to rules 32 and 33. By rule 32, if a member acted contrary to the interests of the society or its rules, he was to be fined or expelled. Held, that the society was illegal."

This case was heard in King's Bench before Lord Alverstone, C. J., Wills and Channell, JJ., all concurring. It was appealed and affirmed by the Court of Appeal in 1904, Cullen v. Elwin, 90 L. T. 840, all three of the judges concurring. In his opinion˙ in this case Collins, M. R., says:

"It is possible for societies to frame rules which contain an element of illegality in them without at the same time vitiating the whole system. It is possible. It is also possible for them to make rules which are apparently and ostensibly innocuous, and yet may vitiate the whole system, because, rightly understood and considered as a whole, their innocent parts are merely ancillary to that part which is not in point of law deemed to be legal. The question on which side of the line the particular rules of a particular society fall is a question of fact in each case."

Again he says:

"At common law agreements in restraint of trade are bad, and combinations in restraint of trade are illegal. But the Trade Union Acts have to a certain extent, and for certain limited purposes, modified the rigour of the common law."

The case of Gozney v. Bristol, etc., Trade & Provident Society (1909) 1 K. B. 901, was an appeal from the county court to King's Bench Division; and from there to the Court of Appeal. The defendant was held to be practically an indemnity company undertaking to pay sick, funeral, and death benefits, and also benefits to members when on strike. The action was brought to recover such benefits not paid. The county court held the society illegal, and the action in consequence not maintainable. This action was reversed by the King's Bench and the reversal approved by the Court of Appeal upon the ground expressed by one of the judges that "this society is just inside the limits of legality," for the reason, as expressed by another of them, that "provisions to encourage or procure a strike may be illegal. Provisions for the assistance of the victims of a strike may be perfectly legal. In these rules I can find no provisions addressed to the procurement or even sanction of a strike." Channell, J., of the King's Bench, in his judgment in this case, says:

"It seems to me that the grounds for suggesting illegality are two: First, there may be illegality in the character of the influence which is exerted, which may amount to unlawful coercion; * * * secondly, that with which I think we have to do in this case, namely, the doctrine as to restraint of trade. Speaking generally, and without pretending to give an exhaustive definition, that doctrine is that it is unlawful to fetter by agreement the freedom of action of any one engaged in trade, as a trader or an employer or a workman, except so far as such fetter is reasonably necessary for the protection of the person seeking to impose such fetter upon others."

Again he says:

"What I think has to be found in order to make the association illegal is that the members agree to submit their own action to the decision of others, and to strike or not as directed. That would certainly make the society unlawful, and probably also it would be unlawful if the object is to combine for the purpose of putting pressure on employers, and thereby to fetter their freedom of action."

In his opinion in the case, Fletcher Moulton, L. J., says:

"To answer this question (of legality of the association) it is necessary to examine the purposes for which the defendant society is formed, and the means whereby it proposes to effect those purposes. If either of these be illegal, it may be necessary to examine more closely into the nature of that illegality to see whether it is of such a kind as to taint the whole constitution of the society and make it an illegal society. * * * It follows, therefore, * * * that the question must be decided entirely by an examination of the contents of the printed book of rules of the society. These rules define its constitution and objects, and set forth the detailed rules adopted by it for carrying out those objects."

The case of Russell v. Amalgamated Society of Carpenters & Joiners seems to have been a test one having been appealed to the Court of

Appeal, and from there to the House of Lords (1910) 1 K. B. 506, and 81 L. J. K. B. 619. In this case it was held:

"Where the rules of a society combined provisions for the militant purposes of a trade union and provisions for the provident purposes of a friendly society, and it was provided by one of the rules that members of the society might be expelled, with the result that they would forfeit all future benefit from the funds of the society, for noncompliance with the decisions of committees directing the militant operations of the society or for violating the recognized trade rules of the district, held, that the main object of the society was illegal at common law, as being in restraint of trade, and that the rules relating to its provident purposes were so inseparably connected with that object as to be affected by its illegality, and therefore unenforceable; and consequently that an action for moneys alleged to have become payable to a member under those rules was not maintainable."

### Vaughan, L. J., of the Court of Appeal, in his opinion says:

"It is not every restraint of trade which will render the provisions of an agreement unlawful, in the sense that it cannot be enforced by action at common law. To have that effect, a restraint of trade must be such as in some way to prejudice the interests of the community. It may do that in a case where the freedom of contract of an individual is restricted to an unreasonable extent by an agreement which he has entered into, or in a case where the area from which employers, not parties to the agreement, can seek to obtain workmen is unreasonably restricted. It may be observed, in passing, that it cannot be said in the latter case, as it can in the former, that the restraint of freedom of trade arises in consequence of the voluntary action of the party whose freedom is restrained; for, in a case where, for instance, the rules of a trade union prohibit their members from working with nonunion men, there is a restraint of trade to the prejudice of employers and workmen other than members of the trade union, quite independently of any action of their own."

### And again:

"With regard to clause 3, which provides that, where one of the committees of the union therein mentioned considers it to the best interest of the members of the union that they should refuse to work with nonunion men, they shall be entitled to trade privileges, it appears to me that this clause does involve a restraint of trade inconsistent with the public interest. The same observation seems to me to apply to clause 6, the important words of which are those providing that any members who may be withdrawn from their employment on the instruction of one of the committees' of the union therein mentioned shall be entitled to trade privileges. The effect of the rules seems to me to be that the members in question must leave work when they are so withdrawn by the instructions of the committee. Then, again, rule 48, cl. 1, appears to me most material for the purpose of showing that the rules contemplate such a restraint of trade as to render them generally unenforceable in law. (The Lord Justice here read the clause.) In my opinion that clause, in substance, from beginning to end amounts to such a restraint of trade as necessarily to render its provisions unlawful. It trespasses against the principle of freedom of contract. The workman is not to be allowed to take a subcontract or do piecework, or to work in fixing, using, or finishing work which has been made under conditions which the union may consider unfair, and, if he does so, he is liable to be expelled from the union. From every point of view this clause is, in my opinion, of such a character that it must of necessity tend seriously to hamper and restrain trade."

### Kennedy, L. J., in his opinion in the case, says:

"The only question before us now is, therefore, as I have said, whether this society is an illegal society at common law. In dealing with that ques-

tion I will not refer to the rules of the defendant society in detail, as they have been already fully dealt with by the other members of the court. Speaking generally, what seems to me to be the vice of these rules is that they provide for a restraint of trade, not shown to be reasonable, in that they involve a surrender by the members of the union of their individual freedom of action; for they provide that a member may be expelled from the society, under rule 48, cl. 1, with the result that he will forfeit all future benefits, unless he renders passive, or, if required, active, obedience to the decrees of certain bodies constituted within the union under the rules."

In his opinion in the House of Lords, Lord Macnaghten, in this case, says:

"The only question, therefore, seems to be this: Is this trade union, apart from the act of 1871, a lawful association? The answer must depend on a consideration of its purposes as manifested in its rules. It is not every restraint of trade that is unlawful. But I cannot doubt that restraint of trade which is unreasonable, oppressive, and destructive of individual liberty is unlawful. And I cannot help agreeing with the learned judges of the Court of Appeal that such is the character of some of the rules of this society; and, further, that, having regard to the constitution of the society, the powers vested in its executive officers, and the blending of its funds for all purposes, it is impossible to separate what is legal from what is not legal."

And in discussing the effect of this Trade Union Act, 1871, as supplemented by the Act of 1876, Lord Robson says:

"It is to be observed that the act did not go the length of abrogating or altering the general law against restraint of trade. It grafted an exception on it in favor of certain classes of persons, but by section 4 it maintained the principle of the old law even against those persons, to the extent of refusing the assistance of the courts in the direct enforcement of contracts between members of a trade union, when the purposes of the union were in restraint of trade. Had it gone further, and altogether excluded the application of the common-law doctrine in this connection, the courts would have been compelled to give full effect by decree, or injunction, to contracts whereby workmen had bound themselves not to undertake certain legitimate kinds of work, and to refrain, under certain circumstances, from working at their trade at all, except by leave of their union, no matter what their immediate necessities might be. Such contracts would then be as legal as any other by which a man limits his freedom of action for a definite time or purpose, and the prospect of the burden which would thus be cast upon the executive, of actively enforcing great numbers of such contracts in periods of industrial hardship or disturbance, was one from which Parliament might well shrink. But the operation of section 4 of the Act of 1871 is not confined merely to contracts in restraint of trade. It enacts also that 'nothing in this act shall enable any court to entertain any legal proceeding instituted with the object of directly enforcing or recovering damages for the breach of' (inter alia) '(3) any agreement for the application of the funds of a trade union,—(a) To provide benefits to members.' Prima facie the agreements thus excluded from the benefits of the act are legal and meritorious, and their exclusion can only be due to the fact that they rest, in some degree, upon a consideration involving a restraint of trade which the law tolerates, but will not directly assist."

See, also, Mudd v. General Union of Operative Carpenters & Joiners (1910) 103 L. T. 45, and Thomas v. Portsmouth "A" Branch of the Ship Constructive, etc., Association, reported in the Times Law Reports May 3, 1912, which are to the same tenor and effect.

I have made this review of the English legislation and decisions in regard thereto to make clear the demonstration of these propositions:

[1] First. That these union combinations under the law must be considered in their threefold relation: (a) To their own members; (b) to those who may employ such members; and (c) to the public interests.

[2] Second. That in their relations to their respective members they cannot, even under the advanced legislation of England, undertake to require, by oath, obligation, constitution, by-law, or rule, a surrender by such members of their individual freedom of action; that, when they seek to do so, they become illegal, and, while tolerated in England under her Trade Union Acts, nevertheless there, by reason of their illegality, neither can the unions enforce such contracts with their members or members with the unions.

[3] Third. That the question of legality is to be determined from an examination of the union's constitutions, by-laws, or rules as they may be called, and, while some such rules may be lawful, yet, if others unlawful in character are of such weight and importance as to dominate the course of the union's action, or, if the lawful and unlawful ones are so interdependent or intermingled as to render separation one from the other impracticable, then the organization becomes wholly illegal.

[4] Fourth. That in their relations to the employers of their members, while they may use all peaceful efforts to advance their members' interests, in the way of aiding them to secure better wages, shorter hours of labor, and better conditions in which to work, they cannot accomplish these ends by any acts of violence, coercion, or intimidation on their part or at their instance. They may not by common law, and in the absence of permissive legislation such as that of the English Act of 1906, interfere with the contracts which their members have entered into, and which are existing between an employer and his employés, nor by any means induce such employés to break such contract or contracts. To break a legal contract is unlawful. Therefore to persuade or induce one to do this unlawful thing is itself unlawful. Further, these unions have no right by intimidation or coercion to destroy the inherent right vested in the employer to control his property, and conduct his business in any lawful manner he may choose. Such employer may fix the terms and conditions upon which he will give employment, may employ whom he desires, refuse to employ whom it pleases him to deny employment, may discharge (in absence of contract) whom he pleases, and refuse to discharge whom he pleases. It is entirely within the right of the union to advise its members in the absence of contract on their part with the employer to quit their labor for him, to strike, in other words, and insist upon other and different terms of employment before they return to labor, but neither the union nor its striking members have any right by intimidation or coercion to prevent other laborers or any of the members of the union itself from assuming the employment under the employer's terms if they so desire. They may by reasoning and persuasion under such conditions induce its own members and others not to assume the employment where the breaking of no contract is involved, but this is as far as they can go.

[5] Fifth. The relation of these unions to the public must be considered in dual aspect: (a) As to the nonunion laboring class seeking competitive work with the union's members; and (b) as to the public generally considered as consumer of the labor's product. As regards the first class, it is to be remembered that, while the membership of organized labor is large, the number of nonunion laborers in this country and especially in this state is many times greater, and it is the law's function and duty to fully, without fear, favor, or partiality, protect the rights of the latter as well as those of the former. These rights guarantee to the laborer the absolute right to join the unions or not as he sees fit. The unions cannot, under the law, use any means of intimidation or coercion to compel him to do so. The limit of their right in this direction is persuasion. If he joins, they cannot compel his continuance in membership. He may withdraw when he desires. The union members as individuals may voluntarily determine not to work with nonunion labor if they so desire, they can cease working themselves on that account, but they can do nothing in the way of intimidation or coercion to compel either other union men or the nonunion men to cease working on the one hand or to prevent the employer from filling their places with other union or nonunion men on the other. The inherent right of the individual laborer to sell his labor, which is his property, in any lawful manner or pursuit, and upon such terms and conditions as he may himself determine to be for his personal best interests, must be upheld by the law just as fully and freely, regardless of these union organizations as it is upheld in all the other relations of our civic life. As said by Sir William Erle in his "Memorandum on the Law Relating to Trade Unions," filed with the Eleventh and Final Report of the Royal Commissioners 1869:

"As to combination, each person has a right to choose whether he will labour or not, and also to choose the terms on which he will consent to labour, if labour be his choice. The power of choice in respect of labour and terms, which one person may exercise and declare singly, many after consultation may exercise jointly, and they may make a simultaneous declaration of their choice, and may lawfully act thereon for the immediate purpose of obtaining the required terms; but they cannot create any mutual obligation having the legal effect of binding each other not to work or not to employ unless upon terms allowed by the combination. Any arrangement for that purpose, whatever may be its purport or form, does not bind as an agreement, but is illegal, though not unlawful, on account of restraint of trade, and therefore void. Every party to it, who chooses to put an end to it, is thenceforward as free to claim his own terms for his own labour as if such arrangement had never been made; and any attempt to enforce, by unlawful coercion, performance of any such supposed agreement, against a party who chooses to break from it and labour or contract for labour upon different terms, is an attempt to obstruct him in the lawful exercise of his right to freedom to trade; and is thus a private wrong. It is also a violation of a duty towards the public—that is to say, of the duty to abstain from obstructing the exercise of the right to the free course of trade. A person can neither alienate for a time his freedom to dispose of his own labour or his own capital according to his own will (see Hilton v. Eckersley, 6 Ell. & Bl. 47), nor alienate such freedom generally and make himself a slave (see the argument of Hargrave in the Negro Sommerset's Case, 20 State Trials, 23). It follows that he cannot transfer it to the governing body of a union."

202 F.—34

As regards the second aspect, the relation of these organizations to the general public as consumers of the products of capital and labor it must be admitted that, in the absence of special legislation such as that of England (of doubtful constitutionality at least in this country under the written Constitutions, federal and state, thereof), it is just as unlawful for labor to combine to form a trust or monopoly as it is for capital to do so. The same rule of common law governs the one as the other, and the act of Congress, known as the Sherman Anti-Trust Law, I conceive to be simply declaratory of this principle. The latest construction of this act by the Supreme Court set forth in Standard Oil Co. v. United States, 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, and United States v. American Tobacco Co., 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663, is that "it prohibits all contracts *and combination* which amount to an unreasonable or undue restraint of trade in interstate commerce." By the English authorities I have hereinbefore cited, it will be perceived that the same doctrine of "unreasonable" restraint of trade has been applied there as against these labor organizations.

Turning our attention to our own country, while it might be interesting to trace the history of these labor combinations in the United States and the decisions of the several states touching their status and rights, it is clearly impracticable to do so within the limits of this opinion. As regards the historical outline, too, it has already been well written in an article on "Trade Unions" in 27 Encyclopædia Britannica (11th Ed. 1911) pp. 150–153. As regards the court decisions of the several states, it is to be always borne in mind that some of the states have enacted legislation touching these organizations differing in character and extent from each other, and that their decisions, based upon and influenced by such legislation, may be found conflicting and confusing as regards each other. For example, New York has passed laws excepting trade unions from restrictions on combinations and conspiracies imposed by other statutes or by the common law; and states like Michigan, Wisconsin, Nebraska, Montana, and North Carolina have laws excepting them especially from the operation of their anti-trust laws. The Texas statute, having a like effect, has been by its Supreme Court declared unconstitutional. See National Cotton Oil Co. v. Texas, 197 U. S. 115, 25 Sup. Ct. 379, 49 L. Ed. 689.

On June 1, 1898, an act of Congress was approved (chapter 370, 30 Stat. 424 [U. S. Comp. St. 1901, p. 3205]), providing for arbitration of controversies between common carriers in interstate commerce and their employés. The act was permissive, and not mandatory in character, as to whether such arbitration should be submitted to by the parties concerned. Its tenth section, however, provided:

"That any employer subject to the provisions of this act and any officer, agent, or receiver of such employer who shall require any employé, or any person seeking employment, as a condition of such employment, to enter into an agreement, either written or verbal, not to become or remain a member of any labor corporation, association, or organization; or shall threaten any employé with loss of employment, or shall unjustly discriminate against any employé because of his membership in such a labor corporation, association,

or organization; or who shall require any employé or any person seeking employment, as a condition of such employment to enter into a contract whereby such employé or applicant for employment shall agree to contribute to any fund for charitable, social, or beneficial purposes; to release such employer from legal liability for any personal injury by reason of any benefit received from such fund beyond the proportion of the benefit arising from the employer's contribution to such fund; or who shall, after having discharged an employé, attempt or conspire to prevent such employé from obtaining employment, or who shall, after the quitting of an employé, attempt or conspire to prevent such employé from obtaining employment, is hereby declared to be guilty of a misdemeanor, and, upon conviction thereof in any court of the United States of competent jurisdiction in the district in which such offense was committed, shall be punished for each offense by a fine of not less than one hundred dollars and not more than one thousand dollars."

This section was held unconstitutional and void in United States v. Scott (D. C.) 148 Fed. 431, Order of R. R. Telegraphers v. Louisville & N. R. Co. (C. C.) 148 Fed. 437, and in Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764. In this latter case the Supreme Court holds such a provision "to be an invasion of personal liberty, as well as of the right of property, guaranteed by the fifth amendment to the Constitution of the United States." This leaves the Act June 20, 1886, c. 567, 24 Stat. 86 (U. S. Comp. St. 1901, p. 3204), 7 Fed. Stat. Ann. 334, entitled "An act to legalize the incorporation of national trade unions," as our only federal law in amendment or modification of the common law upon the subject of trade unions. This statute has been construed by Jenkins, Circuit Judge, in Farmers' Loan & Trust Co. v. Northern Pacific R. Co. (C. C.) 60 Fed. 803. At page 816 he says:

"It was asserted at the argument with great confidence that the act of Congress entitled 'An act to legalize incorporation of national trades unions' (24 Stat. c. 567) had entirely changed the common law. I think the confidence of counsel in the assertion of the proposition was born of zeal, not of judgment. The statute provides for the formation of national trades unions, with power to establish constitution, rules, and by-laws to carry out its lawful objects, and defines the term 'national trade union' to be 'an association of working people having two or more branches in the states or territories of the United States for the purpose of aiding its members to become more skillful and efficient workers, the promotion of their general intelligence, the elevation of their character, the regulation of their wages, and their hours and conditions of labor, the protection of their individual rights in the prosecution of their trade or trades, the raising of funds for the benefit of the sick, disabled or unemployed members, or the families of deceased members, or for such other object or objects for which workingmen may lawfully combine, having in view their mutual protection or benefit.' The most that can be claimed for this statute is that it removes the common-law disability of combination to raise the price of labor, and to establish the conditions of labor. It contains no suggestion of any right to combine or conspire with a view to injure or oppress or interfere with the rights of others. The organization of labor for the purpose specified in the statute is lawful and commendable, but the statute does not sanction the use of a lawful organization for an unlawful purpose. Nor does it permit such organization to invade the rights of others. Under this act, labor may organize to regulate wages, the hours of labor, and the conditions of labor, and for the protection of individual rights in the prosecution of labor; but such lawful organization cannot be employed to injure property, or for the oppression of others, or to harm the public welfare. There is nothing in the statute which sanctions that which the law, as above declared, condemns."

It was also construed in Arthur v. Oakes (C. C. A. 7th Cir.) 63 Fed. 310, 11 C. C. A. 209, 25 L. R. A. 414, where Mr. Justice Harlan says:

"Some reference was made in argument to the act of Congress of June 29, 1886, legalizing the incorporation of national trades unions. 24 Stat. 86, c. 567. It is not perceived that this reference is at all pertinent to the present discussion. That act does not in any degree sanction illegal combinations. It recognizes the legal character of any association of working people having two or more branches in the states or territories of the United States, and established 'for the purpose of aiding its members to become more skillful and efficient workers, the promotion of their general intelligence, the elevation of their character, the regulation of their wages and their hours and conditions of labor, the protection of their individual rights in the prosecution of their trade or trades, the raising of funds for the benefit of the sick, disabled, or unemployed members or the families of deceased members, or for such other object or objects for which working people may lawfully combine, having in view their mutual protection or benefit.' Associations of that character are authorized to make and establish such constitutions, rules, and by-laws as they deem proper to carry out their lawful objects. Those objects, as defined by Congress, are most praiseworthy, and should be sustained by the courts whenever their power to that end is properly invoked. What we have said about illegal combinations has no reference to such associations, but only to combinations formed with the intent to employ force, intimidation, threats, or other wrongful methods whereby the public will be injured, or whereby will be impaired the absolute right of individuals, whether belonging to such combinations or not, to dispose of their labor or property upon such terms as to them seem best."

The only statute of West Virginia relating to these trade unions that could be held to be in amendment or modification of the common law in force in the state is Act Leg. 1907 (Reg. Sess.) c. 78, § 19 (Code Supp. 1909, § 413a1), which re-enacted the latter clause of section 413, Code 1906. Code 1899, p. 1053, § 14. This statute has been construed by the Supreme Court of Appeals in Thacker Coal & Coke Co. v. Burke, 59 W. Va. 253, 53 S. E. 161, 5 L. R. A. (N. S.) 1091, 8 Ann. Cas. 885, wherein Brannon, J., speaking for the court, says:

"The defendants rely on Code 1899, p. 1053, section 14 reading as follows: 'Nor shall any person or persons or combination of persons by force, threats, menace or intimidation of any kind, prevent or attempt to prevent from working in or about any mine, any person or persons who have the lawful right to work in or about the same, and who desire so to work; but this provision shall not be so construed as to prevent any two or more persons from associating themselves together under the name of Knights of Labor, or any other name they may desire, for any lawful purpose, or from using moral suasion or lawful argument, to induce any one not to work on and about any mine.' This statute is a penal, criminal statute; for it makes the acts in it specified unlawful, and by section 17 imposes a punishment. This is a criminal act. It does not pretend to create rights between individuals. It prohibits certain acts, and the proviso simply curtails the scope of the enactment by saying that the enacting clause shall not be construed to impair any right already existing, if existing, to join the organizations therein specified or use moral suasion. It is only a curb upon the enactment. It does not affirmatively grant, create, or originate those rights. It does not make them lawful, if before unlawful. And could the Legislature authorize any person to violate a contract?"

In State v. Goodwill, 33 W. Va. 179, 10 S. E. 285, 6 L. R. A. 621, 25 Am. St. Rep. 863, the Supreme Court of Appeals of West Virginia says:

"The rights of every individual must stand or fall by the same rule of law that governs every other member of the body politic under similar circumstances; and every partial or private law which directly proposes to destroy or affect individual rights or does the same thing by restricting the privileges of certain classes of citizens and not of others, when there is no public necessity for such discrimination, is unconstitutional and void."

And in Gompers v. Bucks Stove & Range Co., 221 U. S. 418, 31 Sup.. Ct. 492, 55 L. Ed. 797, 34 L. R. A. (N. S.) 874, Mr. Justice Lamar, speaking for the court, says:

"Society itself is an organization, and does not object to organizations for social, religious, business. and all legal purposes. The law, therefore, recognizes the right of workingmen to unite and to invite others to join their ranks, thereby making available the strength, influence, and power that come from such association. By virtue of this right powerful labor unions have been organized. But the very fact that it is lawful to form these bodies, with multitudes of members, means that they have thereby acquired a vast power, in the presence of which the individual may be helpless. This power, when unlawfully used against one, cannot be met, except by his purchasing peace at the cost of submitting to terms which involve the sacrifice of rights protected by the Constitution, or by standing on such rights, and appealing to the preventive powers of a court of equity. When such appeal is made, it is the duty of government to protect the one against the many, as well as the many against the one."

Further citation of authority would seem to be unnecessary to establish the proposition that under federal legislation and that of West Virginia the common law is in full force, and that the several propositions I have set forth are the principles of law to govern in the determination of this case. Before applying these principles to this particular organization and case, I cannot, in view of the extended quotations from labor leaders and advocates contained in the brief of counsel for defendants, but disclaim the sentiment expressed by such leaders, to the effect that either the legislative bodies or the courts of this country, federal or state, have been or are unfriendly to labor organizations. The contrary is true. The statute books are full of laws for the benefit of labor to better their conditions, to insure their health, safety, and their lives. Organized labor is entitled to all praise for the effective work done in aid of securing these laws. And the courts of the country have been prompt in fully and effectively enforcing such laws.

[6] All labor unions organized for lawful purposes, and striving to achieve those purposes by lawful means and procedure, are entitled to the protection of the law to the fullest extent, but, on the other hand, any and all combinations, labor or otherwise, organized for unlawful purposes, or being lawful in purpose which are prostituted to unlawful proceeding and to the accomplishment of unlawful ends, should be required either to reform their unlawful purposes, cease from their unlawful procedure, or cease to exist. And no part of the body politic is or can be more vitally interested in the suppression of labor organizations unlawful in purpose or proceeding unlawfully than the members of such organizations lawful in purpose and procedure. In determining the character of this International Mine Workers Union assailed in this case, as disclosed by the near 8,000 pages of evidence, for reasons that will more fully appear hereafter, I purpose to reverse

the order, and consider first its relation to the general public and especially to the citizenship of West Virginia. It appears clearly established that in 1898 this organization had a membership of over 30,000, the bulk of which resided in Western Pennsylvania, Ohio, Indiana, and Illinois; that in that year they sought and secured a joint conference with an organization of coal operators, the employers of its members, in these states. Such conference was had, and as a result a distinct agreement was entered into. From the stenographic report (admitted to be correct) of the "Proceedings of Joint Conference of Coal Operators and Coal Miners of Western Pennsylvania, Ohio and Indiana," subsequently held in Cincinnati, March 8–29, 1910, filed in this cause as "McKinley's Exhibit No. 4," the purport of this Chicago agreement is fully disclosed. In reply to certain propositions presented by the defendant here, Mr. Lewis, then president of the union. Mr. Maurer of Ohio read on behalf of the operators a statement from which I quote:

"The answer of the operators to the proposition of the miners, in order to be thoroughly understood, makes it necessary to recall the history of wage agreements, and trace with brevity the conditions under which we have from time to time met as operators and miners and effected such agreements, so as to show connectedly the factors which have controlled both parties up to the present time.

"In the years prior to any substantial agreement the conditions of the mining industry were very unsatisfactory in their influence upon both the operators of mines and the miners in the various competitive districts. A remedy for this state of chaos was earnestly sought by both parties, and resulted in the early '80's in agreements between the operators and miners of Western Pennsylvania, Ohio, Indiana, and Illinois. In 1886 the institution of contracts between miners and operators was effected. These contracts operated with varying degrees of success and failure for some years and until about the year 1894, when these relations were dissolved. The conditions again took on an aspect of demoralization, which continued with varying degrees of intensity, numerous strikes, lockouts, and consequent loss in wages and profits and sometimes injuries to property, until in the year 1898. During this period the conditions were such, both as to the price received for coal by operators and the price paid to the miners, that it became imperative for the interests of each to re-establish in some form the former agreements. At this time the basing price of the Hocking district was 56 cents per ton for screened lump coal. For a short time immediately preceding that year the mining rate was 51 cents. The working hours in the districts, parties to the early agreements, were from 9½ to 10 hours per day.

"*The chief evil was the fact that districts which did not recognize the United Mine Workers and had no agreements with them produced coal much more cheaply than those districts which sustained contractual relations with that organization. Some of the more important factors influencing these conditions were different methods of producing coal, varying costs of mining, different hours of labor, different sized screens, not mentioning various other elements.*

"In order to correct these most harmful conditions, a joint convention of operators and miners of Western Pennsylvania, Ohio, Indiana, and Illinois, at the solicitation of the miners' officials, was called to meet at Chicago in January, 1898. At this convention an interstate joint agreement was established. After a long session of deliberation and negotiation, continuing over a period of about three weeks, the basing price for mining in Ohio and Pennsylvania was increased from 56 to 66 cents per ton, an advance of practically 18 per cent., and both the existing price and method of screening and weighing of coal was made uniform throughout the entire territory covered by the terms of the contract. As a result of the Chicago convention,

a representative meeting was subsequently held at Columbus, at which a uniform day wage scale was established for inside labor. All of these concessions made by the operators were of substantial benefit to the miners.

"In addition to the advance in the price of mining and the other important concessions enumerated, the action of this convention had an effect of the most far-reaching and salutary character, not alone for the mine workers, but for the entire labor world, in the recognition of eight hours as constituting a day's labor; this being the first recognition of the eight-hour day by any large body of employers in the United States. *The granting of the eight-hour day by the operators, after making these numerous other important concessions, was with the distinct understanding and explicit promise of the miners to give to the operators of the four contracting states adequate protection against the competition of the unorganized fields. From year to year they have been called upon to fulfill that promise.* The operators, parties to that agreement, at the time of its execution, felt that it was absolutely necessary to the safety of their investments that they be protected from the encroachments upon them by their competitors of the unorganized fields. The tonnage of the nonunion fields entering into the competitive market, particularly of West Virginia and Kentucky, at that time was not so large, as it was aggressive and threatening, the total tonnage entering directly into competition from those fields being approximately 600,000 tons. Since, however, coal from this unorganized territory coming into direct competition with Ohio and Pennsylvania has so increased that a fair estimate places this competitive tonnage at 8,000,000 tons, which does not include the tonnage from nonunion fields adjacent to the Pittsburg district. The markets in Western and Northern Ohio, Eastern Indiana, and Michigan, from year to year have been encroached upon by coal from the unorganized districts, until at the present time nearly 50 per cent. of the coal consumed in these markets is supplied from fields operated with nonunion labor. To find a market for the union tonnage displaced in the territory named, the mineowners of Ohio and Pennsylvania within the past five years have made heavy investments and built and equipped large coal docks to secure the markets at the upper lake ports; but these operators now find the nonunion coal rapidly commanding a heavy percentage of this market, when, at the time of the Chicago agreement, the nonunion fields had but a small fraction of this trade, and, unless these conditions are corrected, the markets so secured will soon be replaced by the tonnage from West Virginia and Kentucky. Though in the very heart of the consuming territory, on account of the wide difference between the price of labor in the organized fields of Ohio and Pennsylvania and the unorganized fields of West Virginia, Kentucky, and the fields adjacent to the Pittsburg district, Ohio, and Western Pennsylvania are rapidly losing the markets at their very doors. It is evident to any candid observer that such unfair conditions should not be imposed upon the operators and miners of the unionized territory. That the interests of operators and miners are mutual in every respect does not admit of controversy. *Each is equally concerned in rescuing this business from its present peril.*

"Finally, we ask for the fulfillment of the pledge of 1898 upon which we made to the miners so many important and costly concessions. Though that promise has not been kept, we have continued for 12 years to make additional concessions by increasing the mining price from 66 cents agreed upon at that time to 90 cents, and in other respects conceding demands without any compensating concessions upon the part of the miners, until we now find ourselves at the limit of financial safety. The operators can make no further concessions. It is now, in our view, not only to the interest of the miners, but their duty as well, to do their share to meet these conditions."

The Chicago agreement and its purposes as set forth by Maurer were substantially admitted. In proof of this I quote from the remarks of Mr. Green, a defendant here, as follows:

"Our friend, Mr. Maurer, in the well-prepared statement he has submitted to this convention, referred to an obligation he claims was assumed by the

United Mine Workers of America in the meeting at Chicago in 1898. Mr. Chairman and gentlemen, we agreed that to a certain extent that was right; but I do not believe it was ever understood that one party to this contract was obligated exclusively to carry out that promise. I believe it was intended to be a mutual understanding, and that both sides would co-operate in trying to organize West Virginia and other nonunion districts in order to extend this businesslike basis of adjusting our differences to those fields.

"Let me point to the fact that the United Mine Workers of America have diligently and aggressively attempted to carry out the promise made in Chicago in 1898; that they have done everything in their power to redeem any promise they may have made to organize West Virginia. Since 1898 our organization has at various times spent hundreds of thousands of dollars trying to unionize West Virginia. We have also sacrificed human life in the attempt to redeem that promise. In view of the fact that we have spent hundreds of thousands of dollars and that our organizers, our members who have gone there as missionaries in an attempt to redeem that promise, have sacrificed their lives and their liberties, we should be given credit for what we have done. I want to ask the operators how much money they have spent, and what they have done to aid us to organize West Virginia.

"Is the fact that we have spent hundreds of thousands of dollars appropriated from the small earnings of our people in the central competitive field, and the fact that we have sacrificed the liberty of some of our members, any evidence that we have tried to redeem that promise? Does not that show that we have honestly, sincerely, and diligently attempted to redeem it? I believe, gentlemen, that if the operators had done one-half as much as the miners have done, if they had even co-operated with us in what we have done, West Virginia would be organized and the operators and miners of that state would be here to-day participating in this joint movement."

The "plea in the nature of confession and avoidance" contained in the last paragraph of Mr. Green's argument had been advanced by Mr. Lewis, and was urged by him in these words:

"We want to say, and we say it kindly but positively to the gentlemen on the other side of the house, 'Get together and organize, not only in Ohio and West Virginia'—and I know a lot of you have influence enough over there, if you do as much work as we do, to organize them."

But at the same time it is manifest that he recognized the danger of the public declaration of such purpose, for, prior in the discussion, he had said:

"If I have a proper conception of this movement it means the uplifting of the industry. If I have a proper conception of this movement, it does not mean that either operators or miners can publicly say, 'We will organize West Virginia in order that the miners of Ohio or Indiana can get more work.' That has done more to prevent the organization of West Virginia than anything I know of. Coupled with that is the attitude of Ohio and Western Pennsylvania, probably of Indiana, and I know of some Illinois operators who have gone to West Virginia, and have built human fences around their properties. I mean by that that they surround their properties with pickets, men who, even when the organizers of the United Mine Workers want to walk along a county or township road passing through the properties, is met at the property line and compelled to state what his business is before he can walk on the public highway. Men will say that that is not possible in a free country, but I say it is possible. It is possible in some mining districts in this country, and I believe they are in the United States, because they are in West Virginia, Kentucky, Tennessee, Alabama, and a few places in Pennsylvania."

I further quote from the remarks of Mr. Feehan of Pennsylvania, another member and representative of the union, as follows:

"We are unwilling that the nonunion operators and miners of West Virginia or of any other coal field shall set the standard of prices and the standard of living for the intelligent operators and miners engaged in the mining industry in the states that are represented here. I believe that is the honest opinion of all of the operators who are present. It is unnecessary for me to refer to the fact that many of the operators who are represented here in this joint conference have interests in West Virginia and in other nonunion coal fields whose products are going into the markets they are complaining of. It is true that they have contributed, with the other operators who are engaged in the industry in those states and districts, to keep the organization from obtaining a hold or becoming a factor in the industry in those fields of which they complain. If they will withdraw their objections to the establishment of the organization in those fields, I am sure they would not be confronted with those conditions, and we would be able to remove the evil in a very brief time. The practices resorted to by the nonunion operators of West Virginia are un-American."

## Also from Mr. Maurer's reply:

"We have a condition confronting this convention as grave as confronted the convention that met in Chicago in 1898. We have this great tonnage from the unorganized fields of West Virginia and Kentucky that is absolutely taking away from us our markets, and taking away the employment which belongs to you. It is a condition that not one of us must meet, but that both of us must meet, not only for our protection, but for your protection as well. The cost of living is only incident to it, and the mine-run basis is only incident to it. Every man who swings the pick will agree with me that we can pay you no more for mining coal than we can get for the product of your labor. And I am going to put up to you, I am willing to concede to this convention that West Virginia is not organized, that for 10 or 12 long years the miners have done everything in their power to organize that field, and that they did it diligently and earnestly is admitted, nevertheless that field to-day is unorganized. Nobody is to blame. Neither the operator nor the miner is to blame for that condition; but it is a condition that we must meet, and each one bear his share of the burden. Eight million tons of the coal from that unorganized state is to-day taking away from you the product of your labor, and taking away from the operator every cent of profit he ever had in the business. You cannot correct that. *You may say to us, 'You must get together and agree upon prices. You must get the West Virginia operators in and agree upon a price.' Why, every man who stands here knows that, if the operators in the state of Ohio attempt it, they do so in violation of the Valentine Law, and that the penitentiary stares them in the face. Every miner here knows that, if in the states of Ohio and West Virginia the operators were to attempt anything of the kind, they would violate, not only the Valentine Law of Ohio, but they would violate the Sherman Anti-Trust Law.* It is easy to tell us what to do, but you should also tell us how to do it. Does any miner here believe that the operators of the state of Ohio have not tried to get the best price they can for their commodity? We have some interest in our business, we have our money invested in it, and I assure you that for two years the miners and the railroads have got every cent there was in it, and more too. However, we stayed in the market. We gave you employment. Now it is up to the miners of this state to meet those conditions, and bear their share of that burden. I want to tell you here that, if the miners of the state of Ohio insist on an increased price of their coal, they will lose every bit of business they have on the Great Lakes. You have already lost your commercial business. Who supplies Michigan to-day with commercial coal? Who supplies Detroit? Who supplies Toledo? Who supplies Marion? Who supplies Columbus, right in the heart of the Hocking district? Who supplies Eastern Indiana? Who supplies all of Western Ohio? Tell me, tell me you miners from the

Hocking Valley, who have seen your mines lay idle while West Virginia coal in train load lots has gone past your mines! Tell me you miners in Eastern Ohio, who have stood idly by, and watched Fairmont coal in train load lots taking your markets! Ninety per cent. of that market is supplied by West Virginia coal from the nonunion fields. I say to you the cost of living does not enter into this. I say to you these other elements did not enter into this. I say to you that the best price we can get for our coal under the competitive conditions will not admit of it.

"You miners who mine coal in the state of Ohio, and, if you please, in Western Pennsylvania, know that every bit of the trade I refer to was formerly supplied by Ohio and Pennsylvania, even down to the gas business, but it is now supplied by West Virginia."

### And from Mr. Lewis' rejoinder:

"Now the argument is made that we ought to turn our attention to West Virginia, and stop the competition from that state. I admit that argument is good: but, in order for that argument to have strength, it is necessary for the operators at home to stop the kind of guerilla warfare they have among themselves. Mr. Maurer has very well said—and I am glad he has brought the subject up—that we say to the operators, 'Get a better price for your coal in order that you can pay us a better price for our labor.' Then he supplements that statement, and very properly, by the statement that, if they were to organize to get a better price for their coal, they would be haled into court under the provisions of the Valentine Law of Ohio and possibly sent to the penitentiary. Probably we would, too. He supplements that statement by asking us to tell them how to get a better price for their coal. I am going to tell you. First, stop making war on the railroads. The poor fellows need help! And this proposition is going to be no joke. I recognize what the mining industry is. I recognize that it is more important than transportation. I recognize that the Valentine Law of the state of Ohio was put on the statute books by a lot of political demagogues who believed they were working in the interests of the dear people—and they did it once for the dear people and about 20 times for themselves! I recognize that this industry does not occupy the plane among the industries of the country that it ought to occupy, because we have met in joint conventions year after year and discussed our wage relations, instead of devoting some of our time to going out and telling certain people to keep their hands off our business. The railroad companies of this country say to the mineowners, 'We want our fuel at a certain rate.' The mineowners, in order to get a part of the fuel trade of the railroads, put down the prices in some instances to cost, not because of competition, but because of your desire to get a part of that trade. Then, after securing a part of that trade, the official representatives of the railroads are in so close touch with the leaders of the manufacturing industries of our country that the steam trade, as we call it, buys fuel almost at as cheap a price as the railroad company. Then, in order to make ends meet, somebody must pay a better price, and it is usually the domestic consumers, the masses of the people. And that is where the political demagogues get their work in, because they are the people who have votes, and that is why they have anti-conspiracy laws placed on the statute books."

Mr. Chapman of Ohio, an operator, contributed to the discussion some figures as follows:

"It is an admitted fact that there is a difference to-day of between 40 and 50 cents per ton in the cost of production of coal in the union fields of Ohio and the nonunion fields of the trade east and south of us in West Virginia, Kentucky, Tennessee, and Alabama, and three of those states, gentlemen, are competitors in the markets of Ohio coal—West Virginia, Kentucky, and Tennessee. The production of West Virginia for 1907 was 40,043,311 gross tons; 44,091,000 being net tons. In 1908 the production was 44,091,000 net tons. In 1909 the production was 44,495,000 net tons. Ohio's pro-

duction for 1907 was 32,365,949 net tons; in 1908, 26,287,800 net tons; and in 1909, 27,756,172 net tons. There are some more interesting statistics connected with this proposition. The following are ⁔ numbers of days the miners worked in West Virginia during the years from 1904 to 1909: 1904, 209; 1905, 213; 1906, 237; 1907, 234; 1908, 211; 1909, 192; making an average of 216 days of 10 hours per day, or a total of 2,160 hours worked each year. Reduced to eight hours per day would be an average of 270 days each year. Ohio worked in 1904, 164 days; 1905, 171; 1906, 175; 1907, 204; 1908, 157; 1909, 165 days, an average for the six years of 173 days, or 97 days less than the average work in West Virginia on the eight-hour basis,"

—and then said:

"Now, gentlemen, it is useless, after the discussions that have taken place here by the gentlemen who preceded me, to discuss at any great length the market that the nonunion fields have taken from Ohio in the past. It has been well said that they are putting coal into Columbus, into Michigan, into Detroit, taking the markets that heretofore have been enjoyed by Ohio coal. In the city of Athens, Ohio, which is within three miles of several of the large producing Hocking Valley mines, West Virginia coal is being sold. The gentlemen who are familiar with the situation have informed me that over 2,000 tons of West Virginia coal was sold there between the 1st of September and a short time ago. Even in the town of Logan, one of the points where Hocking Valley gathers its trains to start its coal out to the markets they have, West Virginia coal is taking that market. The gentlemen who were in the Toledo convention and returned on the Hocking Valley train, if they had their eyes open, would have seen full solid trains of Norfolk and Western coal passing up over that road to Toledo. There was not a single car of Hocking Valley coal in the trains. At the town of Bowling Green, 20 miles south of Toledo, when I came through a few weeks ago, I saw every car of coal standing on the side tracks were loaded with West Virginia coal.

"Think of the proposition, gentlemen! Toledo, the central point at which several Ohio coal roads bring everything, and 60 per cent. or more of the coal being consumed there is from West Virginia! The Pennsylvania people have a road coming in there, the Wheeling & Lake Erie have a road coming in there, the Toledo & Ohio Central goes in there, the Hocking Valley goes in there, and the D. T. & I. goes in there on a direct line. Now just consider that proposition for a minute, and is it any wonder that Ohio coal operators and interests are in the condition they are to-day with that state of affairs? It was well said by Mr. Lewis and Mr. Penna that people buy their fuel where they can buy it cheapest. I am not through with this proposition. I want to bring you to the city we are now holding this convention in and give you a few figures. In 1897 Pittsburg shipped by river 1,401,000 tons of coal to the city of Cincinnati. The Kanawha region shipped by river 717,000 tons of coal. The Kanawha fields shipped by rail 704,000 tons. The other interests from West Virginia, Kentucky, and Tennessee shipped here 275,400 tons. Now we will come to the year 1908.

"Pittsburg district shipped 535,000 tons to the city of Cincinnati in 1908 as against 10,401,000 (manifestly a mistake—should be 1,401,000) in 1897. Kanawha shipped by river 867,000 tons in 1908 as against 717,000 tons in 1897, and Kanawha shipped by rail in 1908, 1,848,000 tons, as against 462,-000 in 1897. The Pocahontas district, the Tennessee and Alabama fields shipped in 1908 by rail 1,512,000 tons to the city of Cincinnati as against 275,400 in 1907."

The reasons why West Virginia coals are able to supplant those of Ohio, Western Pennsylvania, Indiana, and Illinois operations in which both sides of this conference were so vitally interested are contributed by both operator and mine representative.

By Mr. Chapman, operator:

"It is not surprising that West Virginia is on a mine-run basis. Why? Because a large per cent. of all the fine coal that is produced in that state

is made into coke. They even crush the lump coal after they produce it to make coke, which is a much more valuable product to them and yields them more returns than the raw coal will. We haven't any of those coals in Ohio or Indiana and they have none of them in Western Pennsylvania outside of the coking coal as it is known there."

By Mr. Feehan, mine representative:

"There is one point I want to bring out that has not been made clear, and that is the disadvantage the operators of Eastern Ohio are put to in competing for the markets against the operators who have interests in West Virginia, and that is the character of the veins. In West Virginia it is not an uncommon thing to have them develop from six to ten feet of clean coal. There is no slate to remove. It is easily mined. It is a good grade of coal. It can find a market; and, when you take into consideration the cost of producing a ton of that coal compared with the little five-foot vein of coal in Eastern Ohio with its many impurities and its thick slate, and the Pittsburg district, with its weak roof, where in many cases it is difficult to operate a machine, as well as many other natural disadvantages the operators have, herein lies the cause of the competition more than in the cost of labor. The cost of labor is not the important factor that is crowding the Eastern Ohio operators out of the market on the Lakes or elsewhere. It is the natural disadvantages that is doing it. There is one advantage the operators in Eastern Ohio have, and that is their geographical situation. They are nearer the lake markets and other markets, and I believe they have an advantage of from 15 to 25 cents a ton in freight rates. I understand that, when the decision of the Interstate Commerce Commission goes into effect, they will have even greater advantages in freight rates. It is fortunate for them that they have these advantages. Were it not for their advantages in the matter of freight rates, I am positive that many of the veins of coal now being worked in Ohio and elsewhere would be abandoned, and they would wait until the big veins with the greater natural advantages in West Virginia were worked out before they would again operate there. These factors have not been seriously enough considered heretofore."

By Mr. Chapman:

"In 1907 and 1908 the miners earned more money in West Virginia at the prices they were paid there than were earned by Ohio. In fact, they earned from $100 to $150 more to the man. That tells the tale concerning that matter. * * * The coals of West Virginia are said to be mined at about one-half the cost of producing Ohio coals, and the West Virginia product has taken the Ohio markets to the full extent permitted by the difference in transportation expenses, leaving Ohio coals only such markets as may be near the mines, and, as the means of transportation increases by which West Virginia coals are put farther into Ohio markets, the prospect of the Ohio mines is not bright."

I quote further from the remarks of Mr. Savage, of Ohio, one of the defendants here, as follows:

"I was surprised a minute ago to hear that some of the operators were not in sympathy with the men in trying to get a readjustment of their freight rates in Ohio. I know as one miner we did all we possibly could in giving testimony before the commission in Columbus, and from what I heard then I believed, and I believe now, that the operators were absolutely right in asking for this readjustment. I believe I can assure you that we will help you in every manner that we can to get that readjustment. But we would ask you, on the other hand, if we are willing to help you—and by helping you we agree we are helping ourselves—if you operators from Ohio and Pennsylvania will lend us the same assistance in West Virginia in getting the mining price up so that competition will not prevail. When we ask that, what do we find? Operators have told me in years past that they were willing to have the miners organized in Ohio, but they were not willing that their

miners should be organized in West Virginia. We find as great opposition on the part of the operators from this state who have mines in West Virginia as we find from the operators resident there. If we are going to work along the line of mutual benefit, let us make West Virginia a union state. Go down there and practice what you preach in Ohio. Help us get the protection of the law in that state, and I think we can organize the miners. Instead of helping us, what have you done? .You have done nothing but retard the progress of our organization in that state. The reason they have assigned to me for their attitude was that the caliber of the men employed .in the mines of West Virginia was such that, if they were .organized, it would be impossible to control them. I believe that a large percentage of those men are as intelligent as we are, and, once they understand the benefits of the organization and the benefits of the contract we enter into, they will observe those contracts as religiously as the miners in Ohio, Pennsylvania, Indiana, or any other state."

And finally from Mr. Zerbe, of Ohio, an operator:

"A very considerable amount of censure and criticism has been put upon some operators who are here because of the fact that they have gone to West Virginia and found investments. I will remind the other side of the house that the men· who have gone into Virginia are business men. They are engaged in the coal industry, and they bring the commodity from one state or another to furnish fuel for such contracts as they take. They have found by experience that you as an organized body are not treating them fairly where they are circumscribed in the production of this commodity. They find that you are putting upon them burdens in the organized fields that do not exist in the unorganized fields. By reason of the fact that you cannot control in the production of this commodity, although we are willing to admit you have made an effort, their market is being taken from them or restricted or narrowed, and many of them in self-defense find it necessary, in order to carry out contracts and fulfill their obligations to those who take this commodity from them, to go to West Virginia and invest in properties there that they may continue a business for which they are obligated. * * * We might argue this up one side and down another for a year, and we would be no nearer a solution of this proposition. We are, when we get through, right up against the one proposition we cannot get through which has been created by the competition brought to bear against us by the operators and the miners of West Virginia in the unorganized field."

It is impossible to deny the conclusions to be drawn from all this. By reason of the natural advantages in the way of superior veins, roofs, and quality, West Virginia coals can be mined for something like 50 per cent. less than those of Ohio, Western Pennsylvania, Indiana, and Illinois, and then even her miners can make better wages. The officers and members of this union are almost wholly residents of Ohio, Western Pennsylvania, Indiana, and Illinois. In 1898 as an organization they entered into a direct contract with the operators of that field for and in consideration of an eight hour labor day and other concessions to organize the West Virginia miners, and, by reason of the control they would have under the unions' laws over such miners when so organized, "protect" these operators in Ohio, Western Pennsylvania, Indiana, and Illinois from the existing open competition even then threatening the markets of such operators especially in the West and the Lake regions. For the purpose of carrying out the agreement, this labor organization has, in the language of the defendant, Green, one of its officers, "at various times spent hundreds of thousands of dollars trying to unionize West Virginia," and "sacrificed

human life in the attempt to redeem that promise." Was this in the interest of and for the bettering of mine laborers in West Virginia? It is impossible to see how it could be, for in this conference between the operators and union representatives in March, 1910, as we have shown, direct statistics were given by Mr. Chapman and not controverted, showing that the West Virginia miners, unorganized, were getting more work and more wages than miners in this unionized field of Ohio, Western Pennsylvania, Indiana, and Illinois. In illustration of this, it seems to me that I may properly refer to conditions as they exist to-day, as disclosed by a public report made to the Governor of the state of West Virginia by a commission appointed by him to investigate and report upon such conditions. The members of this commission were Bishop P. J. Donahue of the Catholic Diocese of this state, Capt. S. L. Walker of the State Militia, and F. O. Blue, State Tax Commissioner, men of the highest character and integrity. From this report and current history it appears that the effort to unionize West Virginia still continues, and has more recently been directed to the Paint Creek and Cabin Creek fields in Kanawha county; that such efforts have led to such a condition of riot, bloodshed, and general lawlessness as to require the Governor of the state to twice put the district under martial law to save life and property. I quote from the report as to the condition of the miners:

"To this inquiry we have devoted special attention within the limits of the time and opportunity at our disposal and after careful personal investigation, supplemented by a great body of formal sworn testimony sifted, and tested by severe and exhaustive cross-examination, this commission has arrived at the unanimous conclusion that the general surroundings of the miners on Paint Creek and Cabin Creek, respectively, are very good when compared with those of the miners of the few unionized plants on the right bank of the Kanawha and with those of the miners throughout the state and the nation. We have gone into their houses and carefully examined them. They are above the average of miners' homes in most places."

And as to wages:

"A careful consideration of the evidence adduced leads us to the following conclusions: (1) The average annual wage of miners in West Virginia for the years 1905–1911, inclusive, is $554.26. (2) The average annual wage of miners on Paint Creek and Cabin Creek is from $600 to $700. (3) The average wage on Paint Creek and Cabin Creek (nonunion) is fully equal to if not greater than that of the miners in the very limited number of unionized plants, in the state on the opposite bank of the Kanawha river. These figures may appear small and inadequate, but, slender as they are, they exceed the average wage obtained in Illinois, a unionized state, which is but $510.86 a year. We have been unable to secure any official figures as to the average annual wage in the unionized states of Indiana, Western Pennsylvania, and Ohio. But we are informed by experts, and we believe, that the average wage in the two states first mentioned probably falls a little below that prevailing in Illinois; while the annual wage in Ohio, owing to local mining conditions, falls a little below those of Western Pennsylvania. This classification, in the order of the rewards of labor, puts West Virginia at the head of the list. If we inquire into these figures more closely, we find they are very substantially affected by several causes, among which comes first the unwillingness of a large number of the miners to work more than four days a week at the most. A minute examination of the pay rolls discloses the fact that 16 or 17 days in the month constitute a high average, and that many engaged in the mines decline to labor more than

12 or 14 days. This is particularly true of some of the native-born miners and many colored men, and results in the necessity of keeping 20 or 30 per cent. more miners in a given operation than would be required if steady application to work were the rule. At several of the mines in the districts under investigation were found men wholly illiterate, and without any special knowledge or skill other than that acquired by their daily experience, earning $4 to $5 and in some cases even $6 a day of eight or nine hours, men with savings bank accounts of $1,000 to $2,000, and others who had purchased out of their savings small farms or other properties adjacent to the mines."

And as to the causes of the trouble:

"This arises, in our judgment, from the efforts of the United Mine Workers to organize the union in the whole chain of plants along said creeks. Their desire is to make the present strike region the place for the insertion of the thin edge of the wedge of unionism with the ultimate aim of organizing the whole state. The frank declaration on oath of Mr. Thos. Cairns, local president of district No. 17, would appear to put this intention beyond the region of doubt. The United Mine Workers Association contends that this is essential to the well-being of the 76,000 or more miners of West Virginia. That by this means and this alone can their lot be improved, their rights safeguarded, and the standard of living so raised as to bring it up to a level befitting a citizen, howsoever lowly, of this republic. All classes of people, recognizing the force of the adage 'In union there is strength,' do so organize. Even the operators themselves form associations. 'Why,' say the toilers, 'should we also not unite in lawful combinations?' The operators cannot and do not resist this right as a general proposition, but their claim is that the peculiar industrial conditions in West Virginia would render it ruinous and therefore impossible for them to recognize the union. The geographical position of this state is such, together with the small consumption within her own borders, that of her total coal output of over 60,000,000 of tons she markets barely 10 per cent. within her own borders and 90 per cent. or more must be hauled to the market through the competing territories of Pennsylvania, Ohio, Indiana, and Illinois known as the four competitive states; that the operators of said states have always on the floors of joint miners' and mineowners' conventions shown fierce and undisguised hostility to this state, endeavoring in every way to crowd her out of the market and going the length of stating by the mouth of one of. Pennsylvania's leading operators that the opening of mines here at all was 'an economic blunder.' Resort has even been had to the Interstate Commerce Commission resulting in reduction of rates to the material advantage of the competitors of West Virginia operators in freight differentials. It has been claimed, too, and with some appearance of probability, that the operators of the said four competitive states are hand and glove with the United Mine Workers in their attempts to unionize West Virginia, so that the representatives of the coal interests of this state must go with their relatively small representation into conventions to regulate conditions and prices, and would come home having rates imposed upon them which, taking into consideration the heavy differentials in railroad hauls, would practically put them out of business and close every mine in the state. They decline, they say, to be wiped out in such fashion. They claim the right to settle their own affairs within the borders of their own state. Even if they come to terms with the district authorities of the United Mine Workers here in West Virginia, these terms may not be approved at the headquarters at Indianapolis, and all the labored attempts at amicable adjustment may fall through. Further, they claim that the few unionized mines in West Virginia do not and cannot obtain anything like an adequate return on the capital invested. And so, to probe this deplorable situation down to the bed-rock of facts, the geographical position of West Virginia is largely responsible for all this industrial strife. Our retarded manufacturing development is also a contributing cause. The consumption of coal within our borders, as elsewhere noted herein, particularly by manufactories, is almost neg-

ligible. No state in the nation has more inviting natural resources nor offers greater inducements to manufacturing enterprise than West Virginia— great areas of superior coal for steam and coke, splendid timber of many species, almost inexhaustible supply of natural gas, and unlimited water power awaiting to be utilized in the arts of industry. It is impossible not to recognize the merit of, and to sympathize with, many of the contentions on both sides of this unhappy quarrel. Most assuredly each party believes unreservedly in the justice of its claims. It is in the attempted enforcement of them that each has passed the limits of justice to say nothing of Christian charity and broad humanity. Two facts loom big over the smaller ones developed in this bulk of testimony—the desperate efforts and often unwarranted and unlawful acts of the United Miners to force the union into the disturbed districts, and the equally desperate, unwarranted, and unlawful acts of the operators and their agents to keep the union out. Thus, for months before the actual break, union agitators, many of them strangers, attempted to invade Paint Creek and Cabin Creek to persuade the miners to join the union. They called meetings of the workers, and described to them the hardships and injustice of their lot and the oppression under which they suffered. The wildest theories concerning the rights of property and the means of production were propounded and advocated, and doctrines closely verging upon anarchy were upheld with such effect that men, who before were living peaceably and in comparative prosperity, purchased Winchesters, revolvers, blackjacks, and other murderous weapons to shoot down the coal 'barons' and their myrmidons. Mild-eyed men, 75 per cent. of them with usually cool Anglo-Saxon blood in their veins, and with instincts leaning to law and order inherited down through the centuries, gradually saw red, and with minds bent on havoc and slaughter marched from union districts across the river like Hugheston, Cannelton, and Boomer, patroled the woods overhanging the creek bed and the mining plants, finally massing on the ridges at the headwaters, and arranging a march to sweep down Cabin Creek and destroy everything before them to the junction. Meanwhile, the operators hurried in over a hundred guards heavily armed, purchased several deadly machine guns, and many thousands of rounds of ammunition. Several murders were perpetrated, and all who could got away. Men, women, and children fled in terror, and many hid in cellars and caves. If ever there was a case for some strong measure like martial law, the conditions prevailing on Monday, September 2, 1912, the eve of the proclamation, presented it. In fact, in the opinion of expert witnesses on the scene, martial law, and martial law alone, was the only measure to meet the desperate situation. We believe, partly on the evidence adduced, and in part from the personal knowledge of two members of the commission who were on the ground, one in active military service, that but for such proclamation taking effect on Tuesday, September 3d, at daylight, there would have been great destruction of property and loss of life in the strike zone. The enormous quantities of Winchesters, revolvers, and other weapons up to machine guns captured from both sides and brought to camp at Paint Creek Junction also bore mute, but eloquent, witness of the height to which the passions of the opposing forces had mounted.

"Now these propositions, trite and fundamental as they are, will assist us to apportion the blame for the strike and the subsequent disorders on Paint Creek and Cabin Creek and the close neighborhood:

"First. Every man has a right to quit his employment, and seek other work for any grievance he has or injustice which he may conceive to have been done to him.

"Second. But he has absolutely no right to obstruct, molest, threaten, or otherwise prevent another man from taking the position he has of his own accord abandoned. Organized society and natural law can never yield one jot or tittle on that head. To do so would be to acquiesce in the régime of brute force—a veritable reign of terror.

"Third. Labor has the right to organize for its benefit, protection, increase of wages, and better living conditions, and to have recognition of such organization.

"Fourth. But its organization has no right to coerce by threats or violence any one to become affiliated with it when he does not desire to do so, nor to assault or put in bodily fear one who desires to labor without belonging to it, nor to destroy property of the employer who does not desire to contract with it, nor to violate its contract with its employer without cause.

"There is abundant evidence before us that a reign of terror was attempted to be organized in the strike district and outside of it. It is true that the officers of the United Mine Workers professed to counsel moderation and a strict observance of law and order on various occasions, but there is testimony tending strongly to show that harangues delivered in public, and of which stenographic reports have been submitted as exhibits, incited the miners to violence and in some cases to murder. These harangues were in some instances delivered in the presence of officers of the United Mine Workers' Association, and from platforms upon which they stood and from which they, too, spoke; but the murderous and anarchistic utterances referred to were never disclaimed or disapproved by them either at the time or subsequent to their delivery. Furthermore, there is some evidence tending to show that officers stood by without interfering or protesting, while nonunion men were brutally beaten. Again, the warning to other miners from outside not to come into the strike region published for many weeks in their local organ and also filed as an exhibit and amounting in effect to a grave threat throws a strong light on the actual situation. We fear that the net result of the action and utterances of those acting and speaking under the apparent sanction and approval of the officers of the United Mine Workers was to foment bitter feeling and to incite to serious breaches of the peace. In all this, even granting that they were not acting against any express law set down in the statute books, yet they were acting against the fundamental principles of right and justice."

These commissioners also examined the mining conditions existing in the Fairmont and Norfolk and Western regions of the state. I cannot extend this opinion by quoting further from it but am justified in saying that they found and report such conditions to be in effect very superior to those obtaining elsewhere in unionized fields, conditions under which men have remained in continuous employment for 15 to 20 years, have saved money and purchased homes and farms, have furnished to them houses comfortable, with electric lights, some with shower baths, good sanitation and water supply, and with wages such as to enable the foreign-born miners in the 44 operations of the Consolidated Coal Company (Fairmont field) to send from $125,000 to $150,000 annually to their dependent relatives in Europe.

All the evidence in this record goes to show pretty conclusively that the 14 years' struggle of this labor organization since it entered into the compact with the operators of Ohio, Western Pennsylvania, Indiana, and Illinois in 1898 to unionize the operations in West Virginia has not been in the interest either of the betterment of mine labor in the state or of upholding that free commerce in coal between the states guaranteed by federal law, but to restrain and even destroy it in West Virginia for the benefit of these unionized competitive states. It may be unfortunate for those states that nature has favored West Virginia, Kentucky, and other Southern states by giving them better coal and less expensive mining conditions, but this does not warrant the operators and miners there to combine and confederate for the purpose of depriving the consuming public of the right to purchase the better coal at the lower cost, if desired. Such a combination is clearly a common-law conspiracy, too far reaching to be reasonable,

202 F.—35

in restraint of trade, as well, in my judgment, a direct violation of the Sherman Anti-Trust Law. It is further in my judgment a combination or conspiracy against the rights of the many thousands of nonunion miners in West Virginia who are entitled to enjoy the advantages in their labor that nature has given them.

But the question at once arises, How could this union carry out this contract with the operators of Ohio, Western Pennsylvania, Indiana, and Illinois to substantially restrain or suppress coal mining in West Virginia, Kentucky, and other states by unionizing them? This brings us squarely to an examination of its constitution, manual, obligations, by-laws, and rules, by which, according to the English decisions, the legality or illegality of such combinations is to be determined. Turning to these, which are in evidence and not denied, we find that, when a miner is initiated into this organization, he is required to take an obligation for life as follows:

"I do sincerely promise, of my own free will, to abide by the laws of this union; to bear true allegiance to, and keep inviolate the principles of the United Mine Workers of America; never to discriminate against a fellow worker on account of creed, color or nationality; to defend freedom of thought, whether expressed by tongue or pen, to defend on all occasions and to the extent of my ability the members of our organization.

"That I will not reveal to any employer or boss the name of any one a member of our union. That I will assist all members of our organization to obtain the highest wages possible for their work; that I will not accept a brother's job who is idle for advancing the interests of the union or seeking better remuneration for his labor; and, as the mine workers of the entire country are competitors in the labor world, I promise to cease work at any time I am called upon by the organization to do so. And I further promise to help and assist all brothers in adversity, and to have all mine workers join our union that we may all be able to enjoy the fruits of our labor; that I will never knowingly wrong a brother or see him wronged if I can prevent it.

"To all this I pledge my honor to observe and keep as long as life remains, or until I am absolved by the United Mine Workers of America."

This obligation is required under assurance beforehand that it will require "nothing contrary to your civil or religious duties," yet it does, in fact, require him to alienate for life or until the union absolves him "his freedom to dispose of his own labor or his own capital according to his own will, * * * make himself a slave" contrary to all law, English, American and common, and in express violation of the Bill of Rights set forth in the Constitution of West Virginia. It binds him never to accept employment in place of a fellow member "idle for advancing the interests of the union or seeking better remuneration for his labor," no matter how anxious he may be to secure work, how well satisfied he might be with the wage offered, and how much he may need the work by reason of a starving family on his hands to support. It further binds him "to cease work at any time I am called upon by the organization to do so," regardless of the dire consequence that may result to him and those dependent upon him. It may well be said that such provisions under the law cannot be enforced. No, not legally, but practically it is different. His refusal to comply with this obligation subjects or may subject him to such social ostracism on the part of his fellow members as to compel

obedience. They may taunt him with being without honor or integrity, they may call him "black sheep," "scab," and other opprobrious epithets given new meanings in the English language because of just such conditions arising under the operations of these labor combinations, and they may and do drive him out of work and the community as shown by the facts set forth in many decisions of the courts of this country. But this is immaterial from a legal standpoint, for, as I have shown, the law distinctly bans such obligations as unlawful, and therefore the requiring them on the part of these labor organizations is unlawful. But to further show how complete control the union thus obtains and how complete the surrender to such control on the part of the member is, I quote further from the constitution of its national organization as follows:

### "Article I.

"Sec. 3. This organization shall be composed of international, district, subdistrict and local unions.

"Sec. 4. The international union shall have jurisdiction over all districts, subdistricts and local unions, which shall be governed by this constitution."

### "Article II.

"Section 1. The officers of the union shall be one president, one vice president, one secretary-treasurer, and an executive board to be composed of one member from each district under the jurisdiction of the United Mine Workers, each district to elect its member of the international executive board, the president, vice president and secretary-treasurer to be members of the board by reason of their position."

### "Article IV.

"Sec. 11. The funds of the organization shall be used for the purpose of assisting those who are in need from idleness or distress, when the payment of the same has been approved by the international executive board."

### "Article VII.

#### "Cards.

"Section 1. Local unions shall provide each member with a due card, upon which the dues and assessments paid by the member shall be entered, which shall be his receipt for the same.

"Sec. 2. Due cards shall not admit any person to membership from one local to another, and to protect the membership of individuals who are unable to pay their dues because of no local existing where they reside, the international, district and subdistrict secretaries shall, upon the payment of dues and assessments by said member, issue the usual cards for the same; provided that this shall not apply to a member living in a locality where a local union is in existence.

"Sec. 3. No person a member of the organization, who holds a due or transfer card showing him to be a member in good standing, shall be debarred or hindered from obtaining work on account of race, creed or nationality. Cards properly filled out and signed by the officers of miners' unions in foreign countries shall be accepted in lieu of initiation fees.

"Sec. 4. Any member desiring to leave the mine where his local is located and work elsewhere shall immediately make application to the secretary of the local for a transfer card, and if he has paid all dues and assessments, the president and recording secretary shall issue a transfer card to him, which shall be attested by the financial secretary, providing the local union is in good standing with the international, district and subdistrict unions, which shall be accepted in any district, and in case such person cannot produce a transfer card he shall pay the regular initiation fee. All transfer cards shall be deposited as the laws of the district where work is secured may direct.

"Sec. 5. When a person who has not been a member of the organization three months or more secures a transfer card from a local union in a district where a dispensation has been granted said transfer card shall not be accepted by any local in a different district from the one in which the local issuing the same is located, unless said transfer card is accompanied by an amount equal to the difference between the initiation fee paid by said member and the initiation fee provided for in the district where the card is deposited.

"Sec. 6. No card shall be issued to any member when the local is three or more months in arrears to the international, district or subdistrict for dues or assessments. Officers of any local union issuing cards in violation of any section of article VII shall be fined $10.00 for each card issued, the fine to be collected in the same manner as dues and assessments.

"Sec. 7. The transfer card must show that the member receiving it has paid all dues and assessments for the month in which it was issued, and must also show at what class of labor he was employed.

"Sec. 8. When a transfer card is issued to any member it must be deposited by him with some local union or with the international secretary-treasurer, within three months after the last day of the month in which it was issued to him, else the card will become void and he can only become a member again by initiation as a new member.

"Sec. 9. When a member presents a transfer card to a local union at any mine where he works or desires to work, the local union must accept the same and admit him to membership in that local, unless the local issuing the same is not in good standing, as shown by the monthly report of the secretary-treasurer, or the person to whom the card is issued has not been a member of the organization for three months as provided for in section 5 of this article, and shall collect from him all dues and assessments from the time between the last day of the month in which the card was issued and the date of depositing the same.

"Sec. 10. The subdistrict, district or international secretary-treasurer shall not accept a transfer card if the member is where he can deposit it with a local union.

"Sec. 11. The international secretary-treasurer shall prepare and send out monthly a statement of all locals three months or more in arrears for dues and assessments, and no local union shall refuse to accept a transfer card from any local unless it appears on said list as being in bad standing. Local unions on strike shall be exempt from the provisions of this section.

"Sec. 12. All transfer cards shall be made in book form, with two stubs attached. The books to be numbered, and each card in the book to be numbered and bear the number of the book. The stubs to be printed in conformity with the card itself. The card and one stub to be filled out by the recording secretary and certified to by the president and financial secretary of the local union granting the same; one stub to be retained by the local issuing the card for future reference, the other stub to accompany the card and must be immediately filled out by the secretary of the local where the card is deposited and returned by him to the secretary of the local that issued the card.

"Sec. 13. The president, financial and recording secretary of the local union shall keep a record of all transfer cards bought by, issued by, and deposited in their respective local unions. The auditing committee shall compare their records every three months, and in the presence of the local union destroy all transfer cards that have been deposited that there is no dispute about."

### "Article XII.

"Sec. 2. Districts may adopt such laws for their government as they may deem necessary, provided they do not conflict with the international union."

### "Article XIII.

"Sec. 2. Subdistricts may adopt such laws for their government as they may deem necessary, provided they do not conflict with international and district constitutions or agreements entered into.

"Sec. 3. All local unions within the territory of subdistricts already organized in any district shall contribute and become a part of the same and comply with its laws, before they are entitled to password or representation in either international or district organization."

"Article XIV.

"Section 1. Local unions shall be composed of miners, mine laborers and other workmen, skilled and unskilled, working in and about the mines, except mine manager, top boss and persons engaged in the sale of intoxicating liquors, and shall be given such numbers as the international secretary-treasurer may assign them.

"Sec. 2. All locals shall be under the jurisdiction of the international, district and subdistrict unions, and may make such laws for their government as they deem necessary, provided they do not conflict with the international, district and subdistrict constitutions or agreements entered into. Any local union or members thereof violating this section shall be subject to a fine of not less than $5.00."

And to further show how this union undertakes to control the freedom of its members to work when and for whom they please, also its determination to destroy the right of the employer to conduct his own business as he pleases and to discharge and employ whom he pleases, I quote these sections of article 10 of this constitution:

"Section 1. When trouble of a local character arises between members of a local union and their employers, the officers of said local shall endeavor to effect an amicable adjustment, and failing in this they shall immediately notify the officers of the district to which the affected locals are attached, and said district officers, shall immediately investigate the cause of complaint; and failing to effect a peaceable settlement on a basis that would be fair and just to aggrieved members, finding that a strike would best serve the interests of the locality affected, they may order the inauguration of a strike, but no local strike shall be legalized or supported by a district unless its inauguration was approved by the officers of the district or by the international executive board, upon an appeal taken by the aggrieved members from the decision of the district officers; any local union striking in violation of the above provisions shall not be sustained or recognized by the international officers.  *  *  *

"Sec. 3. When any member of the United Mine Workers is suspended or discharged, it shall be the duty of the mine committee to immediately investigate the case, and if the member discharged is not guilty of an offense justifying the same, the grievance shall immediately be reported to the subdistrict and district president in writing, under the seal of the local, and if, upon investigation, the report of the local committee is found correct, the subdistrict and district president shall immediately insist upon the reinstatement of the suspended or discharged member.

"Sec. 4. The international officers shall, at any time they deem it to be the best interests of mine workers in a district that is idle, for just and sufficient reasons, order a suspension in any other district or districts that would in any way impede the settlement of the district affected; provided, that such action would conserve to the best interests of the United Mine Workers of America."

I also quote the following from the constitution of district No. 6:

"Article I.

"Section 1. This organization shall be known as District No. 6, of the United Mine Workers of America.

"Sec. 2. One of the objects of this organization is to unite all employés in and around the coal mines of Ohio and the Pan Handle district of West Virginia."

"Article VIII.

"Section 1. In case of trouble arising in any local with the employer it shall be the duty of the local officers to try to effect a settlement; failing in this the grievance shall be presented to the subdistrict president in writing, who shall investigate the grievance or dispute and settle, if possible. Should he fail, he shall consult the district president, who shall settle the dispute either by suspending work or such other methods as they may deem best. In case of a direct violation of agreements the subdistrict president or local union affected are authorized to order a suspension of work.

"Sec. 2. When it becomes necessary for the district president to close a mine, or when a mine or mines from some other legitimate cause has been forced to close down, said officers may, if they deem it wise, close every other mine in district, or may distribute those idle men into any other mine or mines in the district in which said mine or mines so closed may be situated."

"Article IX.

"Section 1. The initiation fee in district 6 shall be $10.00, and all persons applying for and securing work in the mines who are not practical workers shall pay $10.00 initiation fee. Any person applying for work at any organized mine shall present a United Mine Workers' card. In case said person cannot present such a union card he shall pay the regular initiation fee. * * * "

"Sec. 6. All persons employed as check-weighmen shall be members of the United Mine Workers for a period of six months before they are elected to such position. Notice shall be posted near the weigh sheet at least three days before the election of a check-weighman, and no persons are entitled to vote except those who are assessed to pay him his wages."

"Sec. 12. When a miner's son becomes old enough to work in mine he shall be given the preference over other applicants for work."

"Sec. 15. Any member of our organization working in or around the mine, working on idle days or extra time, in violation of our constitution or agreements, shall be fined $2.50 for each offense. * * * "

"Sec. 17. That a fine of $10.00 in each individual case where it can be proven that a member of the union leaves his district for West Virginia, or any other unfair mines, and remains there one month or more without having deposited his transfer card and returns without giving a satisfactory account of why he has not deposited his transfer card; and the fine to be collected by the local union where he works."

And these from the constitution of subdistrict 5 of district 6:

"Article I.

"Section 1. This organization shall be known as subdistrict 5 of District 6, United Mine Workers of America.

"Sec. 2. The object of this organization is to unite the mine employés of Belmont, Jefferson, Tuscarawas, Harrison and Carroll counties in Ohio, and that part of Stark county south of Canton, other than the Massillon seam, and Hancock, Brooke, Ohio and Marshall counties of West Virginia, to ameliorate their conditions by methods of conciliation, arbitration or strike.

"Sec. 3. All men are eligible and must be members of the U. M. W. of A. who work in and around the mines."

"Article IX.

"Sec. 2. That a fine of $10.00 in each case, where it can be proven that a member of our union leaves his district for West Virginia or any other unfair mine, and remains one month or more without depositing a transfer card, and returns without giving a satisfactory account of why he has not deposited his transfer card, and a fine to be collected by the local union where he is working.

"Sec. 3. Any member of our organization working in or around the mine, working on idle days or extra time, in violation of our constitution or agreements, shall be fined $2.50 for each offense."

It very clearly appears from a study of these rules that (a) they undertake to require members of the organization to surrender their individual freedom of action; (b) to coerce nonunion miners to join the union, whether wishing to do so or not for they must be members "who work in and around the mines"; (c) to control or rather abrogate and destroy the right of the employer to contract with the men independent of the organization; (d) to exclude his right to employ nonunion labor if he desires; (e) to limit his right, in the absence of contract, to discharge whom he pleases, when he pleases, and for what reason he sees fit; and (f) to assume the right on the part of the organization, through its officers to control the employer's business, to shut down his mine by calling out the men in obedience to their obligation whenever it is deemed to the interests of the union, regardless of the employer's interests or the effect that such action may have upon him, as regards loss, damage, and necessary violations, on account thereof, of his existing contracts with others. To such extent in this direction does such assumption of power and control go that it is directly provided that such suspension of operations may be ordered, even though there be no dispute between the employer and the union, but solely because such dispute exists between the union and some one or more of his rival operators in business in the same district. In all these particulars these provisions violate the law, guaranteeing under our free government the rights of both the labor and capital involved, and, further, the rights of the public consuming the product of such labor and capital. But still further, and what manifestly is of far more vital importance, under the power so assumed by this close and compact organization, and by reason of these obligations and rules enforced by it upon its members, it is more than probable that, if allowed to unionize and control the mining operations in West Virginia, it will be entirely able to fulfill its express contract of 1898 with its co-conspirators, the operators of Ohio, Western Pennsylvania, Indiana, and Illinois, and "protect" them from the competition of West Virginia coals, restore to them their lost markets, and practically destroy the coal mining industry of this state to accomplish which the union has admittedly already spent hundreds of thousands of dollars and sacrificed human life as yet to no avail. It is not to be assumed that, because I have not discussed other of the rules and purposes of this organization, that I have ignored their meritorious and beneficent character; nor that I have not considered the very natural and human instinct inspiring the officers and members of this union, resident in other states and laboring under physical disadvantage in mining conditions, to regard their personal interests as paramount. Most of its officers have testified in open court before me, and have fully convinced me that they are men sincere in the conviction of the integrity of their action, perfectly frank and truthful in their testimony, self-educated, and who have by their own effort rightly acquired the leadership in their life work. So far as I am concerned, the law requires me to consider these rules of the organization, and ascertain whether any of them are unlawful in character. If so, whether the unlawful ones dominate the actions and purposes of the organization,

or whether the purposes contemplated by the unlawful ones are so intermingled with those designed by the lawful ones as to render separation impracticable. If such domination of the unlawful prevails, or such separation cannot be made, then, under the authorities I have cited, the organization becomes unlawful. In view of the undisputed testimony in this case, I am constrained to believe both unlawful conditions exist as to these rules. They go far beyond those held to be unlawful, dominating, and inseparable by the English cases which I have cited. They have permitted the officers of this organization to expend, by their own admission, hundreds of thousands of dollars of the funds derived from members bound by these rules in an unlawful conspiracy to restrain trade upon such a large scale as to involve the whole vast coal mining industry of West Virginia.

[7] The final question arises, How is this plaintiff, the Hitchman Coal Company, affected, and what right has it to complain and appeal for injunctive relief? The evidence establishes these facts: Plaintiff is an operating coal mining company in the West Virginia field. Its mines are situate in what is known as the Pan Handle just across the Ohio river from Ohio, and this union assumes jurisdiction over this territory incorporating it, with some five counties in Ohio, in subdistrict 5 of district 6 of its organization. Plaintiff started operations in 1903 as a nonunion mine. At this time a company having some stockholders identical with those of plaintiff, and others not such stockholders of plaintiff, was operating a union mine at Mt. Pleasant, Ohio. The officials of the union notified the plaintiff that, if its mine were not unionized, the Mt. Pleasant mine would be shut down by it. On April, 1, 1903, the demand of the union was conceded by plaintiff, and it became a union mine. The next day a strike was called by the union, and plaintiff's men went out and remained out 21 days. This strike cost plaintiff $7,242. Its occasion was a dispute as to the scale price for run of mine coal, and was compromised by the union accepting an advance of about 1½ cents per ton for run of mine coal over what the company had been paying, and much less than had been demanded when the strike was called. The miners resumed work on May 23, 1903, and worked until April 20, 1904, when another strike was called about the run of mine coal; the union officials not being satisfied with the prior year's compromise, and insisting on what was called the average as distinguished from the tonnage basis. The plaintiff yielded, and the average basis was established. This strike lasted until June 15, 1904, 55 days, and cost plaintiff $17,000. On April 1, 1905, the union demanded a return to the tonnage basis, as being more profitable to the miner than the average one. This demand was conceded by plaintiff, and the tonnage basis was resumed. A national strike was called for April 1, 1906. In anticipation of it, plaintiff sought to protect its fuel trade by arranging with the union officials for the men to continue work for that purpose, offering to pay the scale prices demanded by the union. This was at first agreed to upon condition that no commercial and only fuel engine coal should be mined. This permission was later withdrawn, and the men ordered to strike, which they did on April 16, 1906. The

men did not want to quit work, and tried to get permission from their union officials to continue loading engine coal, for the reason that, if they were not allowed to do so, the Baltimore & Ohio Railroad Company would haul in nonunion coal, and have it loaded into their engines from plaintiff's tipple and bins under the terms of plaintiff's contract with the railroad company. The union was notified, too, by plaintiff that, if the men were called out on strike, the mine would not be run union again. This availed nothing. The strike was called, coal was hauled from an Ohio union mine with which settlement had been made by the union by the railroad, and loaded on its engines over plaintiff's tipple. This strike continued until June 12, 1906, 56 days, and cost the plaintiff $24,500. This national strike was finally settled in July, 1906, by the adoption of the 1903 scale, which plaintiff from the start had offered to pay. But in the meantime the Hitchman miners had been promised benefits by the union which were not paid, and they were incensed because the Ohio coal had been allowed to be hauled and loaded on its engines by the railroad over plaintiff's tipple, and because plaintiff's proposition to pay the 1903 scale had not been accepted. Thereupon a mutual agreement was entered into between plaintiff and these individual miners to the effect that the men should abandon the union, and the company should operate the mine nonunion. This was on June 12, 1906, and the agreement was evidenced by memorandum cards signed by the men, reading as follows:

"I am employed by and work for the Hitchman Coal & Coke Company with the express understanding that I am not a member of the United Mine Workers of America and will not become so while an employé of the Hitchman Coal & Coke Company, and that the Hitchman Coal & Coke Company is run nonunion and agrees with me that it will run nonunion while I am in its employ. If at any time while I am employed by the Hitchman Coal & Coke Company I want to become connected with the United Mine Workers of America, or any affiliated organization, I agree to withdraw from the employment of said company, and agree that while I am in the employ of that company I will not make any effort amongst its employés to bring about the unionizing of that mine against the company's wish. I have either read the above, or heard same read."

The men surrendered their charter to the union, and on June 25, 1906, secured a charter from this state as a corporation under the name of the Independent Mine Workers of West Virginia. Prior to April 1, 1903, when the mine ran nonunion, the company had no trouble whatever with its men, and since June 12, 1906, when it started nonunion again, it has run continually without trouble. During the three years and two months from April, 1903, to June, 1906, when unionized, it had three strikes called that suspended its operation for a total of 162 days at a total cost or loss of $48,742. In March, 1907, the subdistrict convention of the union resolved "to take up the work of organizing every mine in the subdistrict as quickly as it can be done." In accord with this resolution, officials of the union, defendants here, called on the plaintiff's management, and expressed their desire to reunionize the Hitchman mine. The company's officials declined the suggestion. The mine officials asked that the matter be referred to the company's board of directors. This was done, and the board of directors declined to have anything to do with the union, and

so notified its officials. Reports were put in circulation among plaintiff's men to the effect that the mine was going to be unionized, and that they had better join the union if they wanted to retain their jobs. Early in September, 1907, the defendant Hughes was sent by the union into the Pan Handle territory to organize the nonunion mines, and compel recognition by them of the union. As a result of his work he secured 22 men to join the union and quit work at a mine known as the Glendale, which was owned by the same stockholders and run by the same management as the Hitchman. He also succeeded in organizing the Richland mine in that territory, and, when its operator refused to recognize the union, shut it down. According to his statements, he succeeded in securing enough men at the Hitchman mine to agree to join the union to enable him to unionize it, and was about ready to and intended to shut it down if its management did not recognize the union. Thereupon the plaintiff company applied for and obtained the restraining order and temporary injunction in this cause. It is also established that Hughes and other officers of this union were beforehand fully informed of the contracts existing between plaintiff and its employés. These facts very clearly demonstrate such interest in this plaintiff in the premises as to warrant its appeal for aid from this court of equity. I conclude, therefore, that this organization, known as the United Mine Workers of America, is an unlawful one because (a) of its principles as set forth in its constitutions, obligation for membership, and rules which (1) require its members to surrender their individual freedom of action; (2) seeks to require, in practical effect, all mine workers to become members of it whether desirous of doing so or not; (3) seeks to control, and restrict, if not destroy, the right of the mineowner to contract with its employés independent of the organization; (4) to exclude his right to employ nonunion labor if he desires; (5) to limit his right to discharge, in the absence of contract, whom he pleases, when he pleases, and for any cause or reason that to him seems proper; (6) assumes the right on its part, by and through its officers, to control the mineowner's business by shutting down his mine, calling out his men upon indefinite strike in obedience to their obligation to the union, whether the men desire to quit work or not, whenever the union's officers deem it to be for the best interests of the union, regardless of the rights and interests of the mineowner, and regardless of his direct loss and damages and such indirect loss and damage as may be incurred by him by reason of the resultant violation of contracts by him with others. Adair v. United States, 208 U. S. 161, 28 Sup. Ct. 277, 52 L. Ed. 436, 13 Ann. Cas. 764. I further conclude that it is an unlawful organization because (b) of its procedure and practices, in that (1) it seeks to create a monopoly of mine labor such as to enable it, as an organization, to control the coal mining business of the country; and (2) has by express contract joined in a combination and conspiracy with a body of rival operators, resident in other states, to control, restrain, and, to an extent at least, destroy, the coal trade of the state of West Virginia. It has spent 14 years time and hundreds of thousands of dollars in effort to accomplish this unlawful purpose. The rules of law relating to the

responsibility of individual members concerned in such combination and conspiracy are plain and well defined. Great latitude in establishing conspiracy by the admission of circumstantial evidence is allowed, circumstances tending in slight degree to a determination of the truth are allowed to be proved. Clune v. United States, 159 U. S. 590, 16 Sup. Ct. 125, 40 L. Ed. 269. The acts and declarations of co-conspirators in execution of a conspiracy are evidence against others of their number. Id. "Where two or more are associated together for the same illegal purpose, any act or declaration of one of the parties, in reference to the common object, and forming a part of the res gestæ, in its execution, may be given in evidence against the others." American Fur Co. v. United States, 2 Pet. 358, 7 L. Ed. 450.

[8] On the question whether a combination is lawful or not, declarations of those engaged in it, explanatory of acts done in furtherance of its objects, are competent evidence after the combination has been proved. Wiborg v. United States, 163 U. S. 632, 16 Sup. Ct. 1127, 1197, 41 L. Ed. 289; Lincoln v. Claflin, 7 Wall. 132, 19 L. Ed. 106. See, also, Sprinkle v. United States, 141 Fed. 811, 73 C. C. A. 285, decided by the Circuit Court of Appeals for this circuit and Ellis v. Dempsey, 4 W. Va. 126, where these principles are fully upheld. In the very recent cases (decided June 10, 1912) of Hyde v. United States, 225 U. S. 347, 32 Sup. Ct. 793, 56 L. Ed. 1114, and Brown v. Elliott, 225 U. S. 392, 32 Sup. Ct. 812, 56 L. Ed. 1136, it is held:

"There may be a constructive presence in a state, distinct from personal presence, by which a crime committed in another state may be consummated, and render the person consummating it punishable at that place. Overt acts performed in one district by one of the parties who had conspired in another district * * * give jurisdiction to the court in the district where the overt acts are performed as to all the conspirators. Until a conspirator affirmatively withdraws from a continuing conspiracy, there is conscious offending that prevents the statute from running."

The law just as clearly lays down the rules to determine what is an unreasonable restraint of trade.

"From the principles which underlie all the cases the inference must be necessarily drawn that if there be any sort of business which from its peculiar character can be restrained to no extent whatever without prejudice to the public interest, then the courts would be compelled to hold void any contract imposing any restraint however partial on this peculiar business, provided, of course, it be shown clearly that the peculiar business thus attempted to be restrained is of such a character that any restraint upon it however partial must be regarded by the court as prejudicial to the public interest." West Virginia Transportation Co. v. Ohio River Pipe Line Co., 22 W. Va. 600, 625, 46 Am. Rep. 527.

In deciding the case of United States v. Addyston Pipe & Steel Co., 29 C. C. A. 141, 158, 85 Fed. 271, 288, 46 L. R. A. 122, Judge Taft said that coal was an article of prime necessity. And in the case of Pocahontas Coke Co. v. Powhatan Coal & Coke Co., 60 W. Va. 508, 56 S. E. 264, 10 L. R. A. (N. S.) 268, 116 Am. St. Rep. 901, 9 Ann. Cas. 667, it is held that coal is properly classified under the head of necessaries. The case of Pocahontas Coke Co. v. Powhatan Coal & Coke Co., supra, also holds:

"A contract, combination, or trust among various producers and sellers of a commodity, the direct and necessary or natural effect of which is to

restrain competition and control the prices of such commodity, is in unreasonable restraint of trade, and void at common law, because contrary to public policy. In determining whether or not a contract or combination is in unreasonable restraint of trade, the subject-matter of the contract or combination, the situation of the parties, and all the circumstances attending the transaction should be considered. In determining whether or not a contract or combination is in unreasonable restraint of trade, it is immaterial whether or not the commodity which is the subject-matter of the contract or combination is of prime necessity, if the commodity is an article of legitimate trade or commerce. In determining whether or not a contract is in unreasonable restraint of trade, all the powers of the contract should be considered, and its character determined, not alone by what has been done under it, but by what may be done under it when all of its powers shall have been fully exercised. It is no defense to the illegality of a contract or combination which is in unreasonable restraint of trade to show that the prices of the commodity which constitutes its subject-matter have not been changed, or even that such prices have been lowered. Unreasonable restraint of trade, which is only partial, is illegal. In order that a combination or trust may be in unreasonable restraint of trade, it is not necessary that a complete monopoly be formed. The combination or trust is in unreasonable restraint of trade if it tends to monopoly and is to the injury of the public."

The Supreme Court of the United States has held to the same view of the common law so far as the common law was considered in deciding the case of Standard Oil Co. of New Jersey et al. v. United States (1911) 221 U. S. 1, 31 Sup. Ct. 502, 55 L. Ed. 619, 34 L. R. A. (N. S.) 834, and the case of United States of America v. American Tobacco Co. et al. and American Tobacco Co. et al. v. United States of America (1911) 221 U. S. 106, 31 Sup. Ct. 632, 55 L. Ed. 663. In Loewe v. Lawlor, 208 U. S. 274, 28 Sup. Ct. 301, 52 L. Ed. 488, 13 Ann. Cas. 815, it was held that the Sherman Anti-Trust Act "prohibits any combination whatever to secure action which essentially obstructs the free flow of commerce between the states, or restricts, in that regard, the liberty of a trader to engage in business; and this includes restraints of trade aimed at compelling third parties and strangers involuntarily not to engage in the course of interstate trade except on conditions that the combination imposes," and that it "makes no distinction between classes. Organizations of farmers and laborers were not exempted from its operation, notwithstanding the efforts which the records of Congress show were made in that direction," and that "a combination of labor organizations and the members thereof, to compel a manufacturer whose goods are almost entirely sold in other states, to unionize his shops and on his refusal so to do to boycott his goods and prevent their sale in states other than his own until such time as the resulting damage forces him to comply with their demands," is a "combination in restraint of trade."

I further conclude that this union, in pursuit of its unlawful purposes to secure control and the monopoly of mine labor, and to restrain, suppress, if not destroy, the coal mining industry of West Virginia in the interest of their co-conspirators, rival operators and producers in Ohio, Western Pennsylvania, Illinois, and Indiana competitive fields, have sought and still seek to compel the plaintiff, the Hitchman Coal & Coke Company, to submit to contractual relations with it as an organization relating to the employment of labor and pro-

duction contrary to the will and wish of said company; that its officers, in pursuance of such unlawful effort to monopolize labor and restrain trade, and with knowledge of the express contracts existing between this plaintiff and its employés, have unlawfully sought to cause the breach of the said contracts on the part of its said employés. It is admitted in the testimony of Lewis, Sullivan, and Savage that, if this injunction is dissolved, such efforts will be repeated. I do not stop now to further consider the law declaring efforts to secure the breach of contracts unlawful. I have fully considered this question in my former opinion in this case to which I now refer.

It therefore necessarily follows that the plaintiff had by reason of the damage and loss it had already incurred and the damage and loss threatened and imminent to it in futuro just right to appeal to this court of equity for injunctive relief; that by reason of its unlawful organization, purposes, and practices as hereinbefore set forth, this organization, combination, or union, as now constituted, is unlawful, and under the law, therefore, has no right to seek plaintiff's employés to become members thereof or to become party to its unlawful purposes and practices.

The injunction will be made perpetual.